# N. Y. SUPERIOR COURT.

## HENRY D. PALMER agt. ROBERT M. DE WITT.

The statutes of *copyright* in England and in this country do not, in any manner, affect the common law ownership of literary composition *before* publication, and *until* publication, an author and his assignees have a proprietary right in the author's production, of which they are not deprived by the statute, and which the court will protect against invasion.

It is evident that congress intended, by the act of February 3, 1831, (by which act all previous acts were repealed) to furnish protection to authors, and secure to them from wrongul appropriations of their works, by providing a means of continuing, in effect, their common law right *after* publication, and not to wholly deprive them of such common law right. For it is well settled that such right ends with publication, whatever that may be. And it is equally clear that the only publication contemplated by the framers of the copyright law, is a publication *in print* and not in any other mode.

It is also evident, that in view of the common law right of authors, existing and recognized at the passage of the act, and the settled belief that such right continues with actual publication or dedication by the author, congress merely intended to enable authors to retain their proprietorship after printing and publishing.

The supplementary act of August 18, 1856, extends to authors of "dramatic compositions" the same protection that is afforded to authors of other works by the act of 1831, and in addition to the sole right to print and publish, they are given the sole right to act, perform, and represent such composition, or to cause them to be acted, performed and represented, on any stage or public place, during the period for which the copyright is obtained. This act (1856), contains also a prohibition against representation of copyrighted plays, without the proprietors consent, similar in terms to the ninth section of the act of 1831.

The fact found in this case, which it is claimed was a publication of the play in question was, that on the 15th day of February, 1868, and for a great number of times thereafter, the comedy was publicly performed and represented at the Prince of Wales Theatre in the city of London, by and with the sanction of the author.

It was not found, nor was there any evidence that the comedy had ever or anywhere been represented without the sanction of the author, or that it was ever put in print by him, or by his authority. The only *publication*, therefore, which can be claimed, was its representation at the theatre on various occasions and in the presence of large audiences.

A single, or indeed a great number of public performances conducted under the authority of the author, will not justify a felonious obtaining of the manuscript for purposes of printing and publishing. The right of obtaining the manuscript, or of

Palmer agt. De Witt.

its con tents. does not depend upon the manner of procuring it, but upon whether the author has parted with his rights by publication.

To give a literary composition value, or to make it property recognized by the common law, the author must be allowed to use it before the public; and if, having submitted it *once* to a public hearing, it is to be deemed a publication, so as to take away the proprietary right, and to deprive the author of the benefit of copyright laws, then obviously, the common law means nothing, and there is no such thing as property in literary work.

The law intended to secure to the author the *beneficial* results of his labors, and to protect him from any piratical invasion of his rights, until he has done some act inconsistent with an exclusive ownership, and which shall amount, in judgment of law, to publication.

It may fairly be assumed that it is not intended in any case, to surrender property in a literary composition, so long as the author of it retains it in manuscript, and uses it before the public for his private pecuniary benefit.

Therefore, there can be no presumption against literary ownership arising from the mere frequency of performance. Such performances are not inconsistent with a continued proprietorship, but are wholly consistent with, and necessary to, the enjoyment of the property.

*Public representation,* therefore, is *not publication,* and does not entitle any person, without the author's consent, to procure it *in any way* for purposes of publication.

Any surreptitious procuring of the literary property of another, no matter how obtained, *whether from memory or otherwise,* if it is unauthorized, and without the knowledge or consent of the owner, and obtained before publication *by* him, is an invasion of his proprietary rights, if the property so obtained is made use of to his injury.

If carrying away in the *memory* of a spectator or otherwise surreptitiously obtaining the contents of a play, is without the consent of, or unauthorized by the owner, and therefore, an infringement of his property in the play, the act is not excused by the omission of the owner, to *notify* the audience that they will not be allowed, or are forbidden to carry it away in that manner.

The result, upon this whole case is, that there was no such publication by the plaintiff or by his assignor of the play in question, as to deprive the plaintiff of his common law right of property in it.

That public representations of the play, were not a publication of it, so as to take away such common law right.

That there is no presumption in favor of the lawfulness of the manner in which the defendant obtained the play.

That the burden is upon him to show that it came into his possession in a lawful manner; and that having failed to show the lawfulness of his possession, he should be deprived of it.

*Heard before Justices* MONELL, JONES *and* FREEDMAN.

APPEAL from a judgment.

This action was brought to obtain an injunction restraining the printing and publishing, by the defendant, of a drama or comedy called "play."

The complaint alleged that immediately prior to Febru-

ary, 1868, T. W. Robertson, of London, England, and author of the drama, sold to the plaintiff the exclusive right of performing the drama upon the stage, and printing and publishing the same, within and throughout the United States. That at the time aforesaid the drama was an unpublished composition, and had not been, nor had it since been, printed, or published in print, by the author, or by any one with his consent, or by the plaintiff or by any one with his consent; nor had it, since the 1st of February, 1868, been printed or published in print by the plaintiff, or by any one with his consent. That the drama had not been produced or publicly performed on any stage in this country, or elsewhere, until subsequent to the sale thereof to the plaintiff, *and that the first performance thereof was on the fifteenth day of February*, 1868, *in the city of London, at the Prince of Wales Theatre, and under the sanction of the author*; but that the author did not thereby confer upon or abandon to the defendant, or to any other person, the right of printing or publishing the drama. That on the tenth day of February, 1868, the plaintiff received from the author a manuscript copy of the drama in consummation of the aforesaid purchase.

The complaint then alleged that the defendant, without the knowledge or consent of the plaintiff, and in disregard and violation of his proprietary right, had printed and published, and offered for sale, printed copies of the drama.

The answer of the defendant, after denying (among other things) that the author, by its public represenation in London, did not thereby confer upon or adandon to the defendant, or to any person, the right or privilege of printing or publishing the drama, alleged, upon information and belief, that the drama was, during the months of February and March, 1868, with the sanction of the author thereof, many times publicly performed or represented in the presence of large audiences, at one or more of the principal theatres in London, England, and that the tickets admitting the spectators

Palmer agt. De Witt.

to said performance contained no notice or prohibition against carrying the said comedy away by memory or otherwise, and using, printing, or publishing the same, nor was any notice to that effect posted in any of the theatres, in view of the spectators.

And the defendant alleged that he received the words of the comedy, and description of the arrangement, general stage directions, and divisons of acts and scenes, as published by him, *from one or more persons, who obtained the same from its performance on the stage at such public representations, while witnessing the same as such spectators.*

The action was tried by the court without a jury. Judgment was rendered in favor of the defendant, dismissing the complaint with costs, the court assigning, as a reason therefor, that the action had been tried (upon substantially the same facts as were before the court at special term) on a motion to dissolve the injunction, and that as, upon such motion, the questions involved had been examined and the injunction dissolved, he felt bound by such decision.

The Justice found the following facts;

*First.* That on and prior to the first day of February, 1868, one T. W. Robertson, a resident of London and a citizen of Great Britain, was the sole author and composer of the drama, mentioned in the complaint. called " Play."

*Second.* That on said 1st day of February, 1868, the said Robertson, for a valuable consideration, executed and delivered to the plaintiff a certain instrument in writing, by which he sold, assigned, and set over to the plaintiff in this action the exclusive right and privilege of printing and publishing, enacting, performing, representing, and producing on the stage, licensing or permitting to be printed, published, enacted, performed, represented, and produced on the stage within and throughont the United States, the said drama called " Play," together with all his rights and privileges therein and thereto, as the author thereof, throughout the United States, and all benefits to be derived there-

from, and delivered to the plaintiff the manuscript of said drama.

*Third.* That prior to the 15th day of February, 1868, the comedy of " Play" had not been printed, published, or performed.

*Fourth.* That on the 15th day of February, 1868, and for a great number of times thereafter, the said comedy was publicly performed and represented at the Prince of Wales Theatre, in the city of London, *by and with the sanction of said T. W. Robertson,* in the presence of large audiences ; and that the tickets admitting spectators to the performance, which were purchased by them, contained no notice or prohibition against carrying the said comedy away, by memory or otherwise, and using or printing the same, nor was any notice to that effect posted in said theatre, in view of such spectators.

*Fifth.* That the defendant received the words of the comedy, and a description of the arrangement, general stage directions, division of acts and scenes, as presented by him, from one or more persons who had seen or heard the same publicly performed, at said public representation in England.

*Sixth.* That on the 25th day of March, 1868, the defendant printed and sold certain copies of the said comedy, identical in all respects with the plaintiff's copy, and still openly offers for sale and sells copies of said comedy.

*Seventh.* That, by reason of the acts of the defendant, the plaintiff has sustained damages incapable of computation, in not having the exclusive sale of said comedy.

The conclusion of law was, that the defendant was entitled to judgment—that the complaint be *dismissed* with costs.

From the judgment entered thereupon the plaintiff appealed.

W. D. Booth, *for appellant.*
Ira D. Warren, *for respondent.*

*By the court*, MONELL, J.—In examining the questions in this case, I no longer feel controlled by the decision made at special term dissolving the injunction, which had been temporarily granted in the action ; and unless that decision is founded on principle and sustained by authority, it is not improper for this court to disregard it.

In deciding the motion for a temporary injunction which was made at special term (7 *Robt.*, 530 ; *S. C. 5 Abb., N. S.*, 130), the learned justice was unable to distinguish the case from that of *Keene* agt. *Clark* (5 *Robt.*, 38). He says " the main question in this case was substantially decided by this court in the case of *Keene* agt. *Clark.*"

There he says, it was expressly held, " that when the spectators of a public performance have not entered into some express or implied understanding with its proprietor, limiting the use they make of the knowledge derived from being present at such performance, they cannot be restrained as to the use by them of so much of it as they can retain and carry away in their memory," and the learned justice then says : " I do not see how this case can be distinguished in principle from the rule thus laid down."

The case of *Keene* agt. *Clark* had been decided, and the opinion, from which the foregoing was quoted, had been published before the defendant's answer in this action was prepared ; and it was intended to bring this case within the *dictum* contained in that opinion, by alleging the *public performance* of the play in London, without notice or prohibition against carrying away the comedy, with stage directions and divisions of acts and secnes, and the procuring the same from one or more persons, who had obtained the same from its performance while witnessing the same as spectators.

If the question in the case of *Keene* agt. *Clark* required, or even authorized, the *dictum* which has been quoted from the opinion, and which seems to have controiled the decision at special term, it would conclude us upon this appeal.

The defendant has brought himself clearly within the principles laid down in that opinion, and whether it meets our approbation or otherwise, it must be regarded as the law of this court, until reversed by a higher tribunal, unless upon examination it shall be found that so much of that decision as has been regarded as authority was *obiter dictum*.

Having been a member of the court which pronounced the decision in *Keene agt. Clark*, and dissenting, as I did from such decision, I am prepared to say that, in my judgment, there were neither facts nor questions in the case which required or allowed the decision to be placed upon any such ground as is embraced in the opinion of the court. To establish this and to explain, what might otherwise be thought to be a disregard of the decisions of my own court, a somewhat lengthy statement of the case is necessary.

That action was brought by Miss Keene, who claimed to be the owner, by purchase from the author, of the play called "Our American Cousin," which was an unpublished manuscript, never having been acted or represented in public, nor printed nor published by the author, who was the literary proprietor of it, and to whose right she claimed she had, by purchase, succeeded; she then alleged that she had produced the play at a certain theatre in the city of New York, having made additions, alterations, and verbal changes in it.

The defendant, from whom she sought to recover damages for performing the play at another theatre, alleged that the play had, previous to its enactment by him, been published, and acted, and represented, and dedicated to the public, constantly and frequently at various times in various theatres of the United States and elsewhere, during the period of five years previously.

On the trial, which was *before a jury*, evidence was given of the performance of the play at various places in the United States, the Britsh provinces, and Australia, both

with and without the authority of Miss Keene. A question to one of the defendant's witnesses, "how often and where the play was acted by the defendant," was excluded, and an exception taken. A verdict was directed for the plaintiff and the exceptions sent tn the general term to be heard in the first instance. No request was made to submit to the jury any question of fact. The justice who tried the action decided that, upon the facts as shown, the plaintiff was entitled te recover.

There were five exceptions only which could be examined at the general term, namely, the one already stated; *Second*, to excluding evidence of the amount one of a plaintiff's witnesses had paid her when he performed the play; *Third*, to refusing to charge the jury that there was no evidence that the plaintiff had sustained any but nominal damages; *Fourth*, to the direction to find a verdict for the plaintiff for the amount proved to be the defendant's share of the net profits; and, *fifth*, to the motion to dismiss the complaint on the ground of the defendant not being a manager.

When exceptions are heard in the first instance at a general term, the questions of fact are not open to review, and as found by the jury are conclusive. The court, cannot, in such ease, set aside a verdict as being against the weight or contrary to the evidence; the power of the court being confined exclusively to an examination of the questions of law presented by the exceptions taken at the trial.

It will be seen from the foregoing statement of the case that none of the "exceptions" involved the necessary or proper consideration of any question of fact, unless the exception to the direction to find a verdict for the plaintiff was sufficient to enable the court to look at the evidence with the view of ascertaining if there was any error in such direction. It may be said, however, of that exception, that it was too general to entitle it to be heard, and should therefore have been excluded.

The exceptions taken, in the order stated, called upon

Palmer agt. De Witt.

the court to say whether there was error as *matter of law :* first, in excluding evidence of the number of times defendant had acted the play; second, of the amount paid for a license to act the play; third, in not dismissing the complaint because there was no evidence of damage ; and last, in directing a verdict for the plaintiff. In the latter exception, it must have been assumed that the evidence established that the plaintiff was the proprietor of the play; that she had not dedicated it to the public, nor published it, and that the defendant, by acting it without her consent, was liable in damages. The ownership of the original manuscript of the play, and the numerous times in which and various places where it had been publicly performed, were undisputed facts; but the court, in directing the verdict of the jury, undoubtedly held that such frequency of performance did not of themselves, whether with or without her consent deprive the plaintiff of her proprietorship in the play. Had those facts, or either of them, been in dispute, and had the attention of the court been called to them by a request to submit such facts to the jury, the question might fairly have beeen preseuted.

No such request, however, was made, and it could not be urged for the first time on an appeal, or on the hearing of exceptions, that there was error in withholding from the jury questions of fact proper for their consideration.

If, nevertheless, the decision of that case had been put on the ground that the undisputed evidence of the frequent performance of the play in various places was a publication of the play or a dedication of it to the public by the plaintiff, whereby she had lost her exclusive proprietorship in it, and therefore she could not recover, I should feel bound to follow it, so far as it could be made applicable to the facts of this case.

But I do understand the decision was placed upon any such grounds. It is true, the learned chief justice who wrote the opinion thought there was sufficient evidence,

and that it ought to have gone to the jury, to say whether the plaintiff had not surrendered the play to the public. But as matter of law, the case does not hold that such frequent performance was either a publication or a surrender to the public, so that it would be no violation of any right of ownership in the plaintiff for any person to obtain the play in any way, and publish it in print. At most, it is held, that whether such frequency of performance was a publication, or would justify a presumption of surrender, was for the jury to decide; and the court did not decide them as matter of law. The ground, therefore, upon which the case was decided was, that it is not unlawful for a spectator to carry away in memory and give to the world an unpublished literary production, the performance of which he has witnessed, or to the recital of which he has listened. No publication by the author, either in fact or by frequency of performance, is required to make it lawful to publish from memory; for a single performance or one delivery of a literary production may suffice as well as a hundred.

The learned chief justice says: "a limited communication of a literary or musical composition, by private lectures, recitations, or it performance, has been held not to surrender its proprietorship to the public; * * * but in the case of a public theatrical performance, the public are held entitled to make use of that faculty which is necessarily addressed by such representation, to wit, the memory, for the purpose of repeating the contents of the play, even in performing it elsewhere, when the owner has laid no restraint upon such use of the knowledge so obtained, and retained by memory only."

There is nothing, therefore, in the decision of *Keene* agt. *Clark* to prevent an examination of the question now before us; and we need not be embarrassed in the consideration of the case by views so ingeniously expressed, but which could be applicable only to a different case than was made at that time.

Palmer agt. De Witt.

The case now before us was tried without a jury, and all the facts have been specially found by the court. The application of the law must be to such facts, and upon them we are to determine whether the judgment below is correct.

Whatever may have been the conflict of judical opinion upon the effect of copyright laws upon the common law rights of authors, it has never been disputed that, by the common law, an author has, until publication, a property in his literary work capable of being held and transmitted, and in the exclusive possession and enjoyment of which he and his assignees will be protected.

This has beer settled by a long series of decisions (*Miller* agt. *Taylor*, 4 *Burr*, 2303; *Donaldson* agt. *Beckett*, 4 *Burr*, 2408; *Beckford* agt. *Hond*, 7 *Term.*, 616; *Woolsey* agt. *Judd*, 4 *Duer*, 389; *Stone* agt. *Thomas*, 2 *Am. Law. Reg.*, 228; *Roberts* agt. *Myers*, 23 *Law Rep.*, 396; *Keene* agt. *Wheatley*, 23 *Law. Rep.*, 440; *Boucicault* agt. *Wood*, 16 *Am. Law Reg.*, 539; *Jones* agt. *Thorn*, 1 *N. Y. Leg. Ob.*, 409).

It was at one time somewhat questioned in England whether such common law right did not continue *after* publication, and was neither restrained nor taken away by the statute 8 *Anne*; but in *Donaldson* agt. *Beckett* (*supra*), the house of lords held that the statute had taken away such common law right, leaving authors without protection *after* publication, except under the statute. And the same view of the effect of *our* statute of copyright is taken by the supreme court of the United States in *Wheaton* agt. *Peters*, (8 *Pet.*, 498, 661.)

It was there held that the acts of congress of 1790 and 1802, were not passed in reference to any existing right, but to originate a right *after publication*, by securing to authors, under its provisions, "the sole right and liberty of printing," &c. To the same effect is the case of *Dudley* agt. *Mayhew*, (3 *N. Y.*, 9.) But the statutes of copyright in England and in this country do not, as I think, in any

manner affect the common-law ownership of literary com-
position *before* publication, and I am, therefore, of the
opinion that, *until* publication, an author and his assignees
has a proprietary right in his production, of which he is
not deprived by the statute, and which the court will pro-
tect against invasion. Let me, however, pursue this in-
quiry a little farther.

A reference to the acts of congress will be sufficient to
show, I think, that it was not intended to affect the com-
mon-law right.

The first section of the act of February 3, 1831, (by
which act all previous acts were repealed), provided that
authors, on complying with the provisions of the act, should
have "the sole right and liberty of *printing*, representing,
publishing, and vending their books;" and the fourth section
declares that no person shall be entitled to the benefit of
the act unless he shall, *before* publication, deposit a *printed*
copy of the title of the book in the clerk's office of the dis-
trict court; and the ninth section provides that if any
person shall print or publish any *manuscript* whatever,
without the consent of the author or proprietor, he shall
be liable for damages, and may be restrained by injunction.

It is evident that congress intended to furnish protection
to authors, and to secure them from wrongful appropria-
tions of their works, by providing a means of continuing
in effect their common law right *after* publication, and not
to wholly deprive them of such common-law right. For
it is, as we have seen, well settled that such right ends
with publication, whatever that may be. It is, I think,
also equally clear that the only publication contemplated
by the framers of the copyright law is a publication *in
print*, and not in any of the other modes which have been
suggested.

The language of that act is—may *print, reprint, publish,
and vend. First*, he may *print*, and then he may publish
and vend. To secure this prvilege, he must deposit a

Palmer agt. De Witt.

"*printed*" copy of the title-page, and that must be done before publication ( *Baker* agt. *Taylor*, 2 *Blatchf.* 85) so that he must print at least the " title-page" before he can secure the protection of the act. If the act gave merely the exclusive right to print, without securing also the exclusive right to publish the printed matter, it would be of no value to the authors ; so that it is evident, that in view of the common-law right of authors, existing and recognized at the passage of the act, and the settled belief that such right continues until actual publication or dedication by the author, congress merely intended to enable authors to retain their proprietorship after printing and publishing. In the case of *Baker* agt. *Taylor*, ( *supra*), printed copies of the book had been sold before the deposit in the clerk's office, which was held to warrant the inference of actual publication, so as to defeat the application for a copyright, and it is intimated that the publication contemplated by the act was a publication in print. This view is strengthened by the ninth section, which expressly protects the proprietorship of a manuscript, and makes it unlawful to print or publish it without consent. If it had been intended to destroy the common-law right, and to require in all cases a copyright to secure the ownership of an unpublished work before printing, then the provisions of the ninth section are wholly inconsistent with such intention, as by that section the common-law right is recognized, continued, and preserved.

This view of the statute is in accordance with *Bartlett* agt. *Crittenden*, 4 *McLean*, 301, *and* 5 *Id.*, 36 ; *Pulte* agt. *Derby*, *Id.*, 332 ; *Little* agt. *Hall*, 18 *How. U. S.*, 170.)

The supplementary act of August 18, 1856, extends to authors of " dramatic compositions," the same protection that is afforded to authors of other works, by the act of 1831, and in addition to the sole right to print and publish, they are given the sole right to act, perform, and represent such compositions, or to cause them to be acted, performed,

and represented, on any stage or public place, during the period for which the copyright is obtained.

In extending the privileges of the copyright law to dramatic compositions, it was necessary to secure to authors, not alone the right to print and publish, which is of little comparative value, but also the sole right to act and represent, which constitutes their chief value; and which right, unless expressly protected by statute, would not continue after printing and publishing. The act of 1856, contains also a prohibition against representation of copyrighted plays, without the propietor's consent, similar in terms to the ninth section of the act of 1831. The provisio in the act of 1856, that nothing therein shall impair any right to act a dramatic representation, which right shall have been acquired by any manager, actor, or other person previous to the securing of the copyright, very clearly recognizes rights acquired *previous* to application for copyright, and continues the common-law rights of proprietors; and is in accordance with what was said in *Wheaton* agt. *Peters*, (8 *Pet.*, 591, 662;) that, independently of the copyright law, an assignee of a manuscript would be protected by a court of chancery.

In respect to the act of 1856, SPRAGUE, J., says in *Roberts* agt. *Meyers*, (13 *Mo. Law Rep.*, 397), that the prior act secured to authors the exclusive right of printing and publishing; and it was only because publication did not embrace acting or representation that such act was passed, superadding that exclusive right, to those previously enjoyed.

This reference to, and examination of the copyright laws, and of the cases cited, leaves it free from doubt that such laws are merely ancillary to the common-law rights of authors, and continue them after publication in *print*, but in no way impairing such rights, so long as the literary composition remains in manuscript, or is not printed; and, in the case of dramatic compositions, superadding the sole

right to represent after publication. Whenever an author gives his composition to the public, he loses his exclusive right to its publication, unless protected by the copyright laws. Hence, where the common-law right of property of an author is invaded, the sole questions involved are—first, has there been a publication, so as to take away, or put an end to such common-law right? and second, has such publication been with the consent or by the authority of the author?

It will not, I think, be claimed that an unauthorized or surreptitious publication in *print* of a literary composition before publication by the author, would defeat the owner's right of property and leave him without protection. If that was so, the copyright laws would, in such case, give no security, inasmuch as the benefit of the statute can be obtained only *before* publication. Whether any surreptitious publication, otherwise than in print, can deprive an author of his property, will be examined hereafter.

The fact found in this case, which it is claimed, was a publication of the play in question, was, that on the 15th day of February, 1868, and for a great number of times thereafter, the comedy was publicy performed and represented at the Prince of Wales theatre, in the city of London, *by and with the sanction* of the author.

It was not found, nor was there any evidence that the comedy had ever or anywhere been represented without the sanction of the author, or that it was ever put in print by him, or by his authority. The only "*publication*," therefore, which can be claimed, was its public representation at the theatre on various occasions and in the presence of large audiences.

It was not claimed on the argument, but was conceded, that the number of public representations of the play was not material upon the question of actual publication, and it was contended that one public performance was sufficient to deprive an author of all proprietary right. The con-

cession, however, did not go to the extent that a single, or indeed a great number of public performances, conducted under the authority of the author, would justify a felonious obtaining of the manuscript for purposes of printing and publishing. Yet, it necessarily, I think, goes to that extent, for, as I shall presently endeavor to show, the right of obtaining the manuscript, or of its contents, does not depend upon the manner of procuring it, but upon whether the author has parted with his rights by actual publication.

The value to an author of his literary composition, beyond the fame it secures for him, is in the amount of money it returns; and the amount of money he gets depends chiefly upon the appreciation of the public. If a composition never comes to the knowledge of the public, its author does not obtain either their applause or money.

It might as well never have been created, or lie in the author's drawer unread.

The definition of literary property, as given in *Keene agt. Wheatley, (supra)*, is the right which entitles an author, or his assignees, to all the use and *profit* of his composition. The property, therefore, which a composer ordinarily has in his composition is the pecuniary value which it has to him, and not merely the amount of fame which he may acquire; and such pecuniary value is necessarily and wholly dependent upon the means which he may lawfully employ, to bring his production before the public, and the approval of the public of his work; and there is no other property in that discription of literary composition. When a right of property in the invention or creation of an author is recognized as an inherent right by the common law, it assumes that the thing to be secured and protected is of value to the owner. The law does not regard as property a thing entirely worthless.

If a literary composition, therefore, derives its value from, and becomes property because of the use which can be made of it before the public, and such value is increased or

Palmer agt. De Witt.

diminished in proportion to the extent of its use, then it becomes very important to know where and when the author's literary property in it terminates.

To give it value, or to make it property, recognized by the common law, the author must be allowed to use it before the public; and if, having submitted it *once* to a public hearing, it is to be deemed a publication, so as to take away the proprietary right, and to deprive the author of the benefit of copyright laws, then obviously, the common law means nothing, and there is no such thing as property in literary work.

Can it be said that once delivering a lecture upon a scientific or literary subject, before a public audience, will forever thereafter deprive the author of his property in the ideas invented or created, and which represent, by a combination of words, his meaning?

If so, then any one who can obtain the manuscript, or access to it, or who, by employing the art of stenography or by the exercise of memory, can carry it out of a public lecture-room, may, without the consent or knowledge of the author, appropriate and use, for his own emolument, the literary production of another person.

I cannot believe there is so little foundation for, or so narrow a limit to, the proprietary rights of an author in his literary labors.

I believe the law intended to secure to him the *beneficial* results of his labors, and to protect him from any piratical invasion of his rights, until he has done some act inconsistent with an execlusive ownership, and which shall amount, in judgment of law, to a publication.

There can be no fixed rule determining when an author has surrendered his literary property. Printing his composition and giving it public circulation would fix the period of surrender in such a case; but one reading of a manuscript lecture, or one performane of a manuscript play, would not;

and if one does not, what greater number, can it be said, will?

The value, to the author, of a lecture or of a play, who derives emoluments from its delivery or representation before public audiences, is not limited to one performance. It may extend to any greater number, and the hundredth performance may bring more ample returns than the first. So that it may fairly be assumed that it is not intended, in any case, to surrender property in a literary composition, so long as the author of it retains it in manuscript, and uses it before the public for his private pecuniary benefit.

Therefore, I think, there can be no presumption against literary ownership arising from the mere frequency of performance. Such performances are not inconsistent with a continued proprietorship, but are wholly consistent with, and necessary to, the enjoyment of the property.

The question of what constitutes publication is not much enlightened by any of the adjudicated cases which have come under my observation. Most of the cases involve considerations arising from copyright laws, and do not undertake to determine when or in what manner an author may be said to surrender his property in his literary work.

The case most, relied on by the defendant, (*Bourcicault* agt. *Delafield*, 33 *Law Jour. N. S. ch.*, 38), arose under the English statute of copyright. That statute provides that *one* public representation or performance of any dramatic piece shall be deemed sufficient, in the *construction of the act*, to be a publication of the work. It was accordingly held, in an action to recover a penalty imposed by the statute, that public performance of the drama in the United States, before taking out a copyright in England, was a publication *within the statute*. Words used in a statute to define the meaning of particular parts of it, are never extended beyond the statute, and have, therefore, no controlling effect, except in the interpretation of the statute. They define the intent and meaning of the law-makers, and

are made to extend the statute to cases not otherwise recognized as coming within its purview. But the legislature cannot, by merely expressing the intent of the law in respect to a particular statute, affect the meaning of words used in other statutes, or deprive them of the significance which they receive from settled principles of the common law. The definition in the Code of Procedure, (§ 462, *et seq.*), it will not be pretended, are conclusive of the meaning of the words, except within the statute.

The case, therefore, of *Bourcicault* agt. *Delafield*, is not an authority upon any question of actual or constructive publication not arising under the English copyright law. Nor is it entitled to any more weight than the statute itself, which is a mere legislative interpretation of what, for *certain purposes,* shall be deemed a publication of a dramatic piece.

Our statute of copyright has no such exception as is contained in the statute of Anne; and the word "published" in our statute has been interpreted to mean, published in *print,* (*Keene* agt. *Wheatley,* 9 *Am. Law R.,* 92). In the case last cited, a bill was filed in the circuit court of the United States, to restrain the performance by the defendants of a manuscript play, which was claimed to be the literary property of the plaintiff. The case turned upon the evidence of the manner of obtaining the play by the defendants, and it was held that, as it appeared that the plaintiff's own theatrical representions of the play were not the means through which the defendants were enabled to represent it, they should be enjoined. Judge CADWALLADER, in his very elaborate opinion, asserts the doctrine, at least as far as this, that public representations of a play may be a publication, so as to authorize an author to produce it from memory, although he denies the right of a reporter to note the words —a distinction not very clearly defined. That point, however, was not necessary to a decision of the case, and the *dictum* may, therefore, be rejected. Upon the subject of

publication, I will here refer to some of the cases, either holding or sustaining that a representation of a play is not necessarily a publication of it, so as to deprive the author of his property in it.

Judge SPRAGUE so held in *Roberts* agt. *Meyers*, (23 *Monthly* 13 *Law Reg.* 396). He said it was not a publication within the meaning of the copyright law, and did not prevent an author obtaning a copyright.

It is affirmed by Judge HOAR, in *Keene* agt. *Kimball*, (23 *Monthly Law Reg.*, 669), where he says : " The representation of a dramatic work upon the stage is not a publication *which will deprive* the author or his assignees of their right of property."

In *Bartlett* agt. *Chittenden*, (4 *McLean*, 300 ; 5 *Id.*, 32), it was held that the author of a lecture did not dedicate the manuscript to the public by using it for the purpose of instructing others. That case went further, and decided that an author did not abandon his right in his composition by permitting pupils or friends to take copies ; and that such copies could not be used in any way not contemplated by the author.

And in *Blunt* agt. *Patten*, (2 *Paine*, 397), a deposit by the author of his work in a public office, such as a chart in the navy department, was held not to make it a public document, which any one might copy.

And again, in *Bourcicault* agt. *Wood*, (16 *Am. Law Reg.*, 539). In a very recent case ( *Crowe* agt. *Aiken, not reported*), decided by Judge DRUMMOND, in the circuit court of the United States, for the district of Illinois, an injunction was asked for, to restrain the representation by the defend ant of the play called " Mary Warner." The play was written by Mr. Taylor for Miss Bateman, and the manuscript was transferred to the plaintiff.

It was publicly represented in London and in the United States, but was not printed. The defendant alleged that the play was obtained from a person in London, who pro-

Palmer agt. De Witt.

cured it from repeated representations on the stage at the Haymarket theatre, and that there was no "*restriction*" against any of the spectators using such play, as they saw fit.

After a lengthened examination of the questions, the court decided to grant the injunction. In the opinion, the ground is distinctly taken that a representation is not a publication, and any manner of obtaining it, without the consent of the author or owner, "except by memory," is a violation of his proprietorship.

As far, therefore, as this case depends upon an actual or constructive publication of the play by the plaintiff or his assignee, the clear weight of authority is, that public representation is not publication, and does not entitle any person, without the author's consent, to procure it in any way for purposes of publication, except, perhaps, when it is procured by means of the memory alone.

I am aware that in the case of *Keene* agt. *Wheatley*, (*supra*), which is followed by *Keene* agt. *Clark*, (*supra*), and again by *Crowe* agt. *Aiken*, each of the learned judges seem to lean to the opinion that an auditor may use his memory as a means of procuring a represented play, and may then lawfully print and publish it. The reason seems to be, that as there can be no power over, or restriction of, the use of the memory, therefore, such use is not unlawful.

It is enough, however, perhaps, for the present case, to say that, even if it is true that an auditor at a public representation may lawfully carry away the play in his memory, and afterwards put it in writing, and from such writing, print and publish, there was no evidence in this case to bring it within that rule. The finding of the court is, that the defendant received the words of the comedy, &c., from one or more persons who had seen or heard it performed. That finding is not enough to justify the conclusion that the person or persons who saw or heard the public per-

formance, had brought it in their memories from the theatre.

The burden of proving the manner in which the play was procured was upon the defendant, and he was bound to show that he had obtained it in a *lawful* way. There are no presumptions in his favor, The right of the plaintiff as owner before publication was absolute, and could be defeated only by showing that the defendant had obtained the play through the memory of an auditor. This is the result of the learned opinion of Judge CADWALLADER in *Keene* agt. *Wheatley*, (*supra*), in which view he has fortified himself by the citation of many cases ; and also of Judge DRUMMOND, in *Crowe* agt. *Aiken*, (*supra*),

But I am compelled to dissent from the opinions of the learned judges in those cases, so far as it is intimated that a spectator may, upon witnessing the public performance of a play, rightfully commit it to memory, and then publish it to the world; and also from a qualified view of the same character, entertained by the learned late chief-justice of this court, as expressed in his opinion in *Keene* agt. *Clark*, (*ubi supra*).

It seems to me that any surreptious procuring of the literary property of an another, *no matter how obtained*, if it was unauthorized and without the knowledge or consent of the owner, and obtained before publication by him, is an invasion of his proprietary rights, if the property so obtained is made use of to his injury. Each of the learned justices admit that a play cannot lawfully be taken down by a short-hand writer from the lips of the actors during a public performance.

If taken thus by a stenographer, is it different, in its legal effect and resulting consequences, from committing to memory and afterwards writing it out ? In principle it is not ? They are only different modes of doing the same thing, and, if without the author's consent, are alike injurious to his interests. The objection is not to the com-

mitting a play to memory, for over that no court can exercise any control, but in using the memory afterwards as the means of depriving the owner of his property. Such use, it seems to me, is as much an infringement of the author's common-law right of property, as if his manuscript had been feloniously taken from his possession I can see no difference.

In the case of *Prince Albert* agt. *Strange*, (2 *De G. & Sma.*, 652), a workman employed to take impressions from copper plates of etchings made by the plaintiff, not intended for publication, took impressions for himself and sold them to the defendant. It was held an infringement of the plaintiff's proprietary right, and an injunction was granted and the impressions ordered to be destroyed.

The pleadings and proofs in this case were shaped so as to bring it within one of the propositions of the learned late chief justice, in *Keene* agt. *Clark*, and it is accordingly found as a fact that the tickets admitting spectators to the performances contained no notice or prohibition against carrying the comedy away, by memory or otherwise, and using and printing the same, nor was any notice to that effect posted in the theatre in the view of the spectators.

Whatever means a prudent man may adopt to prevent his property from being feloniously taken from him, it cannot, I think, be successfully contended that, if he choose to take the risk, he may not leave it exposed without mark or other sign, to designate it as his property; or that, by thus exposing it, he would lose his title, and could not afterwards recover it, or its value, from one who tortiously took it.

A wrong-doer cannot get title to property, or escape the responsibility of this tortious or felonious act, merely because the owner has failed to give public notice or warning that it was not to be stolen.

If carrying away in the memory of a spectator, or otherwise surreptiously obtaining the contents of a play, is

without the consent of, or unauthorized by, the owner, and therefore, an infringement of his property in the play, the act is not excused by the omission of the owner to notify the audience that they will not be allowed, or are forbidden to carry it away in that manner.

Upon a careful consideration, therefore, of the subject, I have not been able to appreciate the distinction which the learned judges in *Keene* agt. *Wheatley, and Keene* agt. *Clark, and Crowe* agt. *Aiken*, have attempted to draw between different modes of obtaining the contents of a manuscript play from its public performance. They are equally objectionable, and are merely different modes of depriving an author of his literary property; and therefore, any *mode* which effectuates that purpose is unlawful. The vice-chancellor says, in *Prince Albert* agt. *Strange*, (*supra* 689), that as to property of a private nature, which the owner, without infringing on the right of any other, may and does retain in a state of privacy, a person who, without the owner's consent, express or implied, *acquires a knowledge of, cannot lawfully avail himself of the knowledge so acquired* to publish, without his consent, a description of the property.

That opinion goes quite as far as is necessary to destroy the distinction alluded to.

There is another case to the same effect. In *Turner* agt. *Robinson*, (10 *Irish Chy.*, 132), a painting on public exhibition for private emolument was seen by spectators, some of whom, from *recollection*, arranged themselves in tableau, representing the figures in the painting, and were photographed.

The sale of engravings made from such photograph was restrained by injunction. The mode adopted for carrying into execution what was denounced by the court as an unlawful act, was the same in the Irish case as was approved of in the two cases alluded to, namely, in the memories of

Palmer agt. De Witt.

the spectators; and the case is, therefore, opposed, as an authority, to the distinction referred to.

My conclusions upon the whole case are, that there was no such publication by the plaintiff or by his assignors of the play in question, as to deprive the plaintiff of his common-law right of property in it.

That public representations of the play were not a publication of the play, so as to take away such common-law right.

That there is no presumption in favor of the lawfulness of the manner in which the defendant obtained the play.

That the burden is upon him to show that it came into his possession in a lawful manner; and that, having failed to show the lawfulness of his possession, he should be deprived of it.

I am, therefore, of the opinion that the plaintiff is entitled to a judgment restraining the defendant from further printing or publishing the play, and requiring him to deliver up to be destroyed such as are now in print, and that, therefore, the judgment appealed from should be reversed.

We were asked by the appellant's counsel, if we came to the conclusion that the judgment below was erroneous, to pronounce an absolute judgment in his favor, and not to send the case back for a new trial. But in the uncertainty of the law on the subject of ordering judgment absolute at general term, we think it safest to refuse the request.

The judgment should be reversed, and a new trial ordered, with costs to the appellant, to abide the event.