# NICHOLS *v.* PITMAN.

(*From the American Law Register.*)

A lecturer who delivers a lecture from unpublished manuscript to a limited audience, may enjoin the subsequent publication of such lecture by one who has taken it down in shorthand and attempts to publish it for his own profit.  In such a case the implied understanding between the lecturer and his audience is, that the audience are quite at liberty to take the fullest notes they like for their own convenience, but they are not at liberty to use such notes for the purpose of publishing the lecture for profit.

KAY, J.   This is a case in which the question raised is perhaps a little different from that in the case of *Abernethy* v. *Hutchinson*, 2 L. J. Ch., 209; 1 H. & T. 28, before Lord ELDON.   It seems that the plaintiff is a Fellow of the Royal Geographical Society, and of the Geological Society, and the author of several scientific works.   He is also accustomed to deliver lectures, and amongst the subjects upon which he lectures, he has chosen one which he calls "The dog as the friend of man."   I must take it from his affidavit that, before he delivered the lecture, he had written it in a manuscript, which manuscript he never published; and that, having written it, he delivered it in the year 1882 at the Workingmen's College, on which occasion the audience were admitted, not on payment, but by special leave by obtaining tickets; and only those who had tickets could attend and hear the lecture.   It seems that the defendant, who is a shorthand writer, attended, and took down a copy—almost a *verbatim* copy—of this lecture in shorthand, which, of course, he had a perfect right to do.   Merely taking down a lecture in shorthand is not a breach of any right at all; the defendant might take the lecture down and use his notes for the purpose of refreshing his memory, or for any other purpose he chose.   The question, however, is whether, having so taken the lecture down, he had the right to publish the same for profit.   He says the profits are very small, but, of course, I cannot lay any stress upon that.   Whether the profits are large or small, the question of right must be just the same.   Now, had he that right or not?   It has been argued properly that this case is distinguishable from *Abernethy* v. *Hutchinson, ubi sup.*

Vol. IV—No. 50.

It seems that in that case Lord ELDON, as his manner was, doubted, and would not, in the first instance, make any order. But the matter stood over on more than one occasion and was re-argued, and upon the ultimate argument and additional affidavit had been made, which stated that the facts were these: "That Dr. Abernethy had given his lecture orally, and not from a written composition, but that he had notes which amounted to a greater mass of writing, written in a very succinct manner, from which he delivered the lecture; that a considerable portion of such notes had been expanded and put into writing with a view to publication, and that, at the time of delivering his lecture, he did not read or refer to any writing, but delivered it orally from recollection of his notes. On a subsequent occasion, before the ultimate hearing, he again made a further affidavit, in which he said that no person had a right to attend the lecture except those who were admitted to the privilege by the lecturer, and it had always been understood by him, and those who preceded him in the office which he held, and those who attended the lectures, that the persons who so attended did not acquire any right to publish the lectures which they heard, but that the lecturer retained the sole right of publishing his lectures; and further, that there was an implied contract that none of them should publish his lectures or any part of them. Of course that negatives the notion of there being any express contract between the plaintiff, Dr. Abernethy, and those who attended his lectures. Then, upon that additional evidence, after very mature consideration, the Lord Chancellor delivered judgment and said that, "where the lecture was orally delivered, it was difficult to say that an injunction could be granted upon the same principle upon which literary composition was protected, because the Court must be satisfied that the publication complained of was an invasion of the written work, and this could only be done by comparing the composition with the piracy. But it did not follow that, because the information communicated by the lecturer was not committed to writing, but orally delivered, it was, therefore, within the power of the person who heard it to publish it. On the contrary, he was clearly of opinion that, whatever else might be done with it, the lecture could not be published for profit." I take that to mean, that every person

who delivers a lecture, not committed to writing but orally delivered from memory, has such a property in that lecture that he may prevent anybody who hears it from publishing it for profit. Then his Lordship goes on: "He had the satisfaction now of knowing (and he did not possess that knowledge when this question was last considered) that this doctrine was not a novel one, and that this opinion was confirmed by that of some of the Judges of the land."

All those are general observations, without the least reference to the facts of that particular case. Lord ELDON then adds that "he was, therefore, clearly of opinion that when persons were admitted as pupils or otherwise, to hear these lectures, although they were orally delivered, and although the parties might go to the extent, if they were able to do so, of putting down the whole by means of shorthand, yet they could do that only for the purposes of their own information, and could not publish for profit that which they had not obtained the right of selling." His Lordship goes on to observe that there was no evidence how the defendants got possession of the lectures: "But as they must have been taken from a pupil or otherwise in such a way as the Court would not permit, the injunction ought to go upon the ground of property; and, although there was not sufficient to establish an implied contract as between the plaintiff and the defendants, yet it must be decided, that as the lectures must have been procured in an undue manner from those who were under a contract not to publish for profit, there was sufficient to authorize the Court to say the defendants shall not publish." Now, it is quite true that the learned Judge seems at one moment to refer to the ground of property, and at another to that of implied contract. But I take his meaning to be that, when there is a lecture of this kind delivered to an àudience, especially where that audience is a limited one admitted by tickets, the understanding between the lecturer and the audience must be that, whether the lecture has been committed to writing beforehand or not, the audience are quite at liberty to take the fullest notes they like for their own personal convenience; but they are not at liberty, having taken those notes, to use them afterward for the purpose of publishing the lecture for profit. This is the ground upon which I am going to decide this case. The case does not

come within the statute of 5 & 6 Will., 4, C. 65, because notice in writing was not given to two Justices under Sec. 5 of that act. I do not know whether it is a case in which notice could properly have been given, because it was a lecture delivered at a public college (for I think it is sufficienty proved before me that the place where it was delivered answers the description of a public college), and that is one of the cases in which it is not necessary to give notice. But if the notice be not given, or if the place be a public school, or college, or any public foundation, then the law relating thereto is to remain the same as if the act had not been passed. That will be the law as laid down by Lord ELDON, which is the law I am bound to administer in this particular case. I, therefore, must hold that this is a case in which the defendant ought to be restrained by injunction. I cannot regard the publication of the lecture in a system of shorthand—the key to which is in everybody's hand who chooses to buy it—as being different in any material sense from any other kind of publication. The only question that remains is, whether this is a case in which the defendant ought to be made to pay the costs. I am afraid I must order him to do so, because he had invaded a right of property, and published that which he had no right to publish.

A perpetual injunction was granted, with costs, and an order was made for delivery up of two copies of the lecture in terms of the notice of motion. Inquiry as to the profits or damages was waived.

In regard to the foregoing, Marshall D. Ewell, Esq., of Chicago, writes:

That at the common law the owner of an unpublished literary composition has an absolute property therein, or, as stated in the leading case of *Wharton* v. *Peters*, 8 Pet., 591, 657, that an author at common law has a property in his manuscript, and may obtain redress against one who deprives him of it, or by improperly obtaining a copy endeavors to realize a profit by its publication, cannot be doubted. (See the cases collected in Cooley on Torts, 354; Drone on Copyrights, 10.) It is said by Judge COOLEY, on the point above referred to, that, with respect to this sort of property, "a publication, to constitute an abandonment, must be literally one which puts the production

before the general public." The property of an author, in his intellectual production, is absolute until he voluntarily parts with all or some of his rights. There is no principle of law by which he can be compelled to publish it or to permit others to enjoy it. He has a right to exclude all persons from its enjoyment; and, when he chooses to do so, any use of the property without his consent is a violation of his rights. He may admit one or more persons to its use to the exclusion of all others; and, in doing so, he may restrict the uses which shall be made of it. He may give a copy of his manuscript to another person without parting with his literary property in it. He may circulate copies among his friends for their own personal enjoyment, without giving them or others the right to publish such copies: Drone on Copyright, 102, 103, where the cases are well collected.

*Abernethy* v. *Hutchison*, referred to in the principal case, was a bill filed by a distinguished surgeon, Abernethy, to restrain the unauthorized publication in the *Lancet*, of unpublished lectures delivered by the plaintiff at the theatre of St. Bartholomew's Hospital, London, on the principles and practice of surgery, and for an account of the profits made by the defendants. In this Lord ELDON said that he was clearly of the opinion that "when persons were admitted as pupils or otherwise to hear these lectures, although they were orally delivered, and although the parties might go to the extent, if they were able to do so, of putting down the whole by means of shorthand, yet they could do that only for the purposes of their own information, and could not publish for profit that which they had not obtained the right of selling."

In *Keene* v. *Kimball*, 16 Gray, 545, in which it was held that the representation of a dramatic work, of which the proprietor has no copyright, and which he has previously caused to be represented and exhibited for money, is no violation of any right of property, although made without license of the proprietor, HOAR, J., in delivering the judgment of the Court, said: "It should, perhaps, be added, to avoid misconstruction, that we do not intend, in this decision, to intimate that there is any right to report, phonographically or otherwise, a lecture or other written discourse which its author delivers before a public audience and which he desires after to use in like manner

for his own profit, and to publish it without his consent, or to make any use of a copy thus obtained. The student who attends a medical lecture may have a perfect right to remember as much as he can, and afterwards to use the information thus acquired in his own medical practice, or communicate it to students or classes of his own, without involving the right to commit the lecture to writing for the purpose of subsequent publication in print or by oral delivery. So any one of the audience at a concert or opera may play a tune which his ear has enabled him to catch, or sing a song which he may carry in his memory, for his own entertainment or that of others, for compensation or gratuitously, while he may have no right to copy or publish the musical composition." To the same effect see *Bartlett* v. *Crittenden*, 4 McLean, 300, s. c. 5 *Id.*, 32; *Macklin* v. *Richardson*, Ambl., 694; *Bouccicault* v. *Fox*, 5 Blatchf., 87; *Palmer* v. *De Witt*, 40 How. Pr., 293; Drone on Copyright, 107 *et seq.* *Caird* v. *Sime*, 18 Ir. Law Times, 179.

The principal case differs not in the principle from the authorities above cited, but only in the manner of the publication; and while the manner of the publication was not such as to make the subject-matter known nearly so widely as if it had been published by printing in the ordinary manner, this seems to be a question merely of degree and not in the least to affect the principle of decision. Upon the whole, the case, though new in the instance, seems grounded upon principles that cannot successfully be controverted.

---

## STATE STATUTES IN FEDERAL COURTS.

*(Judge Wm. Archer Cocke, in American Law Journal.)*

This subject is of much interest in our State jurisprudence, and though but little discussed by our Courts and text writers, is yet one of importance, and well worthy of consideration, as involving a right of which the States are fully entitled to exercise as one of supremacy in the philosophy and practice of State rights, which has been duly considered by the highest judicial authority of the United States, are fully conceded as a constitutional right belonging to the States.

It is said by a present writer of great authority: