Allen, J.
 

 Whatever rights the plaintiff has in the drama,
 

 which is the subject of the controversy, exist at common-law, independent of any statute either of the State or the United States. The protection he seeks is of property, and a right of property which is well established and recognized wherever the common-law prevails, and not of a franchise or privilege conferred by statute. The State courts have jurisdiction, as in other actions affecting common-law rights or property interests. It may be doubtful whether the act of congress of 1831 (chapter 116, section 9, 4th Statutes at Large, 436) gives an action in respect to manuscripts, other than such as may be the subject of a copyright, under the laws of the United States. In
 
 Keene
 
 v.
 
 Wheatley
 
 (9 American Law Register, 45), the Circuit Court of the United States had jurisdiction by reason of the citizenship of the parties, and the case was decided by the rules of the common-law and upon the authority of adjudged cases in this country and in England. But if jurisdiction is, by the statute, conferred upon the federal courts in a case like this, the act does not purport to and does not make the jurisdiction exclusive, or deprive State courts of
 
 *536
 
 jurisdiction in actions, legal or equitable, touching the common-law rights of authors. At most, the statute gives parties within its provisions, and not claiming the benefits of a copyright under the laws of the United States, a cumulative remedy and a choice of tribunals. The jurisdiction of the State courts in cases in which it had before been exercised, was not taken away or in any respect impaired.
 

 The common-law rights of authors, as now recognized, existed before the passage of copyright laws, and have not been taken away or impaired by those laws. By section 9 of the - act of congress of 1831, no new right is secured or conferred, but simply a remedy for the violation of an existing right in another forum.
 
 (Pierrepont
 
 v. Fowle, 2 Wood & Min., 43;
 
 Woolsey
 
 v. Judd, 4 Duer, 379.) The objection to the jurisdiction of the courts of the State is not well taken.
 

 The rights of authors in respect to their unpublished works, have been so frequently and elaborately considered and carefully adjudicated by the courts of this country arid of England, and are' now so well understood and established that there is but little to do in passing upon the merits presented by the record before us, save to apply the rules clearly deducible from adjudged cases of conceded authority. The author of a literary work or composition has, by law, a right to the first publication of -it. He has a right to determine whether it shall be published at all, and if published, when, where, by whom, and in what form. This exclusive right is confined to the first publication. When once published it is dedicated to the public, and the author has not, at common-law, any exclusive right to multiply copies of it or to control the subsequent issues of copies by others. The right of an author or proprietor of a literary work to multiply copies of it to the exclusion of others is the creature of statute. This is the right secured by the
 
 “
 
 copyright ” laws of the different governments. It is said by Yates, J., in
 
 Millar
 
 v.
 
 Taylor
 
 (4 Burr, 2303, 2379), “ that it is certain that every man-has a right to keep his own sentiments if he pleases; he certainly has a right to judge whether he will make them public, or commit
 
 *537
 
 them only to the sight of his friends. In that state, the manuscript is, in every sense, his peculiar property, and no man can take it from him, or make any use of it which he has not authorized, without being guilty of a violation of his property; and as every author or proprietor of a manuscript has a right to determine whether he will publish it or not, he has a right to the first publication, and whoever deprives him of that priority is guilty of a manifest wrong, and the courts have a right to stop it.”
 

 This principle thus early enunciated has controlled in every case in which the property right of authors, or their manuscripts before publication, has been determined. This common-law right “ of first publication ” is sometimes spoken of as c< copyright before publication,” while the right to multiply copies secured by statute, is called in contradistinction “
 
 copyright
 
 after publication.”
 

 Mr. Phillips, in his treatise on the law of copyright, at page 2, speaking of the two rights, says: “ Copyright before publication is the more ancient of the two. It is the exclusive privilege of first publishing' any original material product of intellectual labor. Its basis is property; a violation of it is an invasion of property, and it depends entirely on the common-law.”
 

 The right is well defined and succinctly stated by the author of a recent work as follows; “ Every new and innocent product of mental labor which has been embodied in writing, or some other material form, being the exclusive property of its author, the law securing it to him as such, and restraining every other person from infringing his right. Whether the ‘ideas thus unpublished take the shape of written manuscripts of literary, dramatic or musical compositions, or whether they are the designs for works of ornament or utility planned by the mind of an artist, they are equally inviolable while they remain unpublished, and the author possesses an absolute right to publish them or not as he thinks fit (and if he does not desire to publish
 
 *538
 
 them), to hinder their publication, either in whole or in part, by any one else.”—Shortt on the Law of Literature, 48.
 

 It would be a waste of time to refer in detail to the very many cases in which this original proprietary right of authors has come under review by the courts. They uniformly decide or assume the right to be as thus epitomized by Mr. Shortt, and the adjudications of the courts of the United States and of England are in entire harmony upon this branch of the law. (2 Story Eq. Juris., sec. 943;
 
 Hoyt
 
 v.
 
 Mackenzie,
 
 3 Barb. Ch. R., 320;
 
 Wheaton
 
 v.
 
 Peters,
 
 8; Peters, 591;
 
 Little
 
 v.
 
 Hall,
 
 18; How,
 
 165; Prince Albert
 
 v.
 
 Strange,
 
 1 McN.
 
 &
 
 G., 25.)
 

 An author or proprietor of an unpublished literary work has then a property in such work, recognized and protected both here and in England, and the use and enjoyment of it is secured to him as of right. This property in a manuscript is not distinguishable from any other personal property. It is governed by the same rules of transfer and succession, and is protected by the same process, and has the benefit of all the remedies accorded to other property so far as applicable. It is personal, as other movable property, personal in legal contemplation, following the person of the owner, and is governed by the law of his domicile. That which is regarded and protected as property by the law of the owner’s domicile, as well as by the laws of this State, must be equally within the protection of the law, whether the owner be a citizen or an alien. (Story Oonf. Law.) §§ 376,379, 380. If the character of property was impressed upon the fruits of mental labor solely by statute, it might be otherwise, as the statutes could have no extra territorial force. But where, as in this case, it is property by the law, common both to this country and the domicile of the author, the right is equally within the protection of the law in both places.
 

 Beal property is governed by the
 
 lex loci reisitae,
 
 and an alien can only acquire and have title as permitted by the local law. But not so as to personalty. In
 
 Calvin’s
 
 case (7 Co. R., 17a,) it was held that
 
 “
 
 An alien friend may, by the
 
 *539
 
 common-law, have, acquire and get within the realm by-gift, trade or other lawful means, any treasure or goods personal whatsoever, as well as any Englishman, and may maintain action for the same.” This has always been accepted as the common-law of the United States. An alien friend may resort to the tribunals of this State for the prosecution of any right recognized by our laws, or the redress of any wrong cognizable by our courts.
 

 The right to literary property is as sacred as that to any other species of property. The courts of the State are open to an alien friend pursuing his property, and seeking to recover it from a wrong-doer; and there is nothing in any positive law, or in the policy of the government, which would close the door against the same alien friend seeking protection for the fruits of his mental labor, by restraining its publication against his wishes. The protection afforded by the common-law to literary labor is very slight at the best, but such as it is, it is accorded to alien friend and citizen alike, and both are regarded with equal favor.
 

 In declaring the rules of law and applying legal remedies for the redress or prevention of wrong, there is no distinction between the right of the banker to his bills and bonds embezzled and found here in the possession of a wrong-doer, and the right of an author to Ms manuscript clandestinely or surreptitiously taken and brought here for publication, to Ms prejudice and the destruction of all its value as property. Both resort to the courts for the protection of acknowledged rights of property, and are entitled to the remedies given by law.
 

 Until published, the work is the private property of the author, whereever the common-law rights of authors are regarded. When once published, with the assent of the author, it becomes the property of the world, subject only to such rights as the author may have secured under copyright laws, and they can have no force or give any rights beyond the territorial limits of the government by which they are enacted. The rights of assignees domiciled here, of alien
 
 *540
 
 authors resident abroad, have been sustained by the courts of this country, and no distinction has been made between transfers of literary property and property of any other description.
 
 (Keene
 
 v.
 
 Wheatley, supra; Crane
 
 v.
 
 Aitken,
 
 4 Am. Law Reg., 450.) The case of
 
 Jefferys
 
 v.
 
 Boosey
 
 (4 H. L. C., 978), relied upon by the counsel for the defendant, arose under the statute of Anne, and the question decided was as to the rights of a British subject, who had procured an assignment of the work of an alien author, for which a copyright had been granted to the author under the laws of his government to a copy-right under the English statute, and the decision was adverse to the claim of the assignee, but against the opinion of six of the ten judges of the law courts, to whom the question was submitted by the House of Lords. The statute of Anne has since been repealed, and the case is not important now, except for the general principles to be gathered from the opinions of the j udges. The authority of the decision was questioned in
 
 Soutbridge v. Low,
 
 Law Rep.; 3 H. of L. Cases, 100.
 

 The alienage of the author is no obstacle to him or his assignee in proceeding in our courts for a violation, or to prevent a violation of his rights of property in his unpublished works.
 

 The assignability of a copyright before publication is not questioned. The right of sale and transfer is one of the inseparable incidents of property, and the property in a manuscript may be transferred, and upon the death of the owner goes to the personal representatives or next of kin of the owner, as other personal property. A literary man realizes the product of his labor either by the sale of his manuscript or the publication and sale of his works.
 

 The copyright acts recognize the assignability of literary works before publication, and the rights of assignees are protected the same as those of the author. (Per McLean, J.,
 
 Wheaton
 
 v.
 
 Peters, supra.)
 
 The assignment under which the plaintiff claims is of the exclusive right and privilege of printing and publishing, enacting, performing, representing
 
 *541
 
 and producing on the stage, licensing or permitting to be printed, published, enacted, performed, represented and produced on the stage, within and throughout the United States, the said drama called “ Play,” etc. It is not a transfer of the manuscript and of all the rights of the author therein. It is the transfer of the author’s rights with all the benefits which would result from the absolute ownership within the United States. The right is local in one sense, as only embracing a part of the globe, but general and universal as far as this country and government are concerned.
 

 It is said, in
 
 Jefferys
 
 v.
 
 Boosey (supra),
 
 that copyright was indivisible, and that the owner could not assign a part of the right, as to print in a particular place or country, or do anything less than assign the whole right given by the English law. But whether the instrument is called a transfer or a license is not material. The plaintiff has, for a valuable consideration, acquired the right to the first publication of this drama, as well as the right to represent the same upon the stage in the United States, and it is a right of pecuniary value. It is true it may be lost by publication here or elsewhere.
 
 (Jefferys
 
 v.
 
 Boosey, supra.)
 
 But the plaintiff, under his transfer, might restrain the author, as well as
 
 every
 
 other person, from publishing the work within the United States to his prejudice. As against the author and' all the world, the plaintiff has acquired, by the payment of a valuable consideration, an equitable right to the first printing and publishing the drama here, and the right is within the cognizance of a court of equity.
 

 The only question remaining is whether this common-law right, “ copyright before publication,” has been lost or surrendered. There is no complaint that the defendant is representing or intends to represent or produce the drama upon the stage. The alleged violation of the plaintiff’s right consists in printing and publishing the work. After the transfer to the plaintiff, this play was brought out and represented on the stage in one or more of the London theaters, and has also been performed in the city of Hew York, by the agency or
 
 *542
 
 permission of the plaintiff. The fact is found that the . defendant received the words of this comedy and a description of the arrangement, general stage directions, division of acts tod scenes, as printed by him, from one or more persons who had seen or heard the same publicly performed in England. It is not found that it was reported by the witnesses of the performance from memory, and it would be entirely consistent with the findings that copies of the play as performed, with the stage directions, etc., were surreptitiously obtained and put in the possession of the defendant. Whether upon the facts, as found, the defendant might lawfully produce or represent the play upon the stage, is not before us. The rélief demanded by the complaint is, that the defendant be restrained from printing, publishing, selling or offering for sale the drama called “ Play,” or causing the same to be printed, published, etc., and for an accounting.
 

 The fight publicly to represent a dramatic composition for profit, and the right to print and publish the same composition to the exclusion of others, are entirely distinct, and the one may exist without the other. The copyright acts which secured to authors the exclusive right, for a limited time, to print and publish their works, did not secure to them the exclusive right of the public representation of their dramatic compositions. Until the passage in England of the statutes 8 and 4 William IV (chap. 15), an author could not prevent any one from publicly performing on the stage any drama in which the author possessed the copyright. He could only prevent the publication of his work by multiplication of copies of it. It could be produced on the stage from published copies, and repeating a piece on the stage from memory was not a publication in violation of the author’s right first to print and publish ; that is, the right known as “ copyright before publication.”
 
 (Coleman
 
 v. Waltham, 5 J. R., 245;
 
 Murray
 
 v. Elliston, 5 B. & Ald., 657;
 
 Russell
 
 v.
 
 Smith,
 
 12 Ad. & Ells., 217, per Lord Duncan, Ch. J.) The act of 3 and 4 William IV, secured to the author, or his assignee, of any dramatic piece, the sole right of having it represented
 
 *543
 
 within the British dominions for a limited period; and, in 1856, by act of congress (11 Stats. at Large, 138), a like right was given to authors and proprietors of dramatic compositions, for which a copyright should thereafter be granted under the laws of the United States.
 

 So far as is disclosed by the case, the drama remained in manuscript until printed by the defendant, and there is no claim that it has been published by the author or the plaintiff, or with their assent, except by its public performance on the stage; and if it has not, by that act,
 
 become publici juris,
 
 it still remains the private property of the author or his assignee, who alone have the exclusive right to it, and may prevent its publication. When a literary work is exhibited for a particular purpose, or to a limited number of persons, it will not be construed as a general gift or authority for any purpose of profit or publication by others. An author retains his right in his manuscript until he relinquishes it by contract, or some unequivocal act indicating an intent to dedicate it to the public. An unqualified publication by printing and offering for sale is such a dedication. The rights of an author of a drama in his composition are two-fold. He is entitled to the profit arising from its performance, and also from the sale of the manuscript, or the printing and publishing it. Lectures and plays are not, by their public delivery or performance, in the presence of all who choose to attend, so dedicated to the public that they can be printed and published without the author’s permission. It does not give to the hearer any title to the manuscript or a copy of it, or a right to the use of a copy. The manuscript and the right of the author therein are still within the protection of the law, the same as if they had never been communicated to the public in any form. The permission to act a play at a public theatre does not amount to an abandonment by the author of his title to it, or to a dedication of it to the public. It was so decided in 1770 in
 
 Macklin
 
 v.
 
 Richardson
 
 (Ambler, 694), and the rule as then adjudged has never been departed from. (2 Story Eq. Juris., § 950;
 
 Keane
 
 v.
 
 Wheatley, supra
 
 ;
 
 Boucicault
 
 
 *544
 
 v.
 
 Fox,
 
 5 Blatch., 98 ;
 
 Crane
 
 v.
 
 Aiken,
 
 4 Am. law Review, 450;
 
 Keene
 
 v.
 
 Kemball,
 
 16 Gray, 545.) The printing and selling copies of the drama by the defendant was a violation of the legal and equitable rights of the plaintiff, as the sole proprietor of the right to print and publish the work within the United States; and the plaintiff was entitled, upon the case made, to the relief demanded.
 

 The order granting a new trial should be affirmed, and judgment absolute given for plaintiff pursuant to stipulation.
 

 All concur. Folg-er, J., absent.
 

 Judgment accordingly.