The complainant seeks, by this suit, to prevent the defendant from depriving him of his rights in certain literary property. The complainant claims to hold the exclusive right to exhibit or produce, for gain, in the United States, an operetta called "Erminie," and he charges the defendant with having produced, before a public audience in Trenton, in October last, an operetta entitled, "Robert Macaire; or, the Two Thieves," which is substantially identical with that of "Erminie." The defendant has publicly announced by advertisements that he will produce his operetta at other places in this state. Against the injury which will result from such further productions, the complainant asks to be protected by injunction.
The facts before the court establish clearly, I think, that the complainant has such property rights in "Erminie" as to entitle him to the protection of the law. The proofs show that a dramatic writer by the name of Paulton, residing in England, composed the libretto of "Erminie," designed its scenery, and originated its casts of character, their individualities, and the dress and deportment of its dramatis personæ Paulton, in December, 1886, for a valuable consideration, transferred by written contract to the complainant the exclusive right of producing "Erminie" in the United States for a period of time which has not yet expired. There is no dispute that the complainant made a large expenditure of money in putting his operetta on the stage, nor that he has produced it for the amusement of the public in such manner as to render it extremely popular, and make it a financial success. The proofs also show that the complainant's libretto is unpublished, existing in a single manuscript, never having been donated to the public in any way.
These facts for the present, and in the United States, place the complainant in the position of the owner of "Erminie," and entitle him to all the remedies which the owner of such property may resort to for its protection. The right to literary property is just as sacred, and just as much entitled to the protection of the law, as the right to any other kind of personal property. Its acquisition and succession are governed by the same legal rules which control the acquisition and succession of other property of the same general class, and, if the rights of its owner are violated, he is entitled to the same remedies to which the owner of other personal property may resort for redress. The established rule defining the rights of the owner of such property may be stated as follows: every new and innocent product of mental labor, which has been embodied in writing, or some other material form, while it remains unpublished, is the exclusive property of its author, entitled to the same protection which the law throws around the possession and enjoyment of other kinds of property. Whether the product of such labor consists in literary, dramatic or musical compositions, or designs for works of ornament or utility, planned by the mind of an artist, they are equally inviolable while they remain unpublished, and their owner may exercise the same supreme dominion over them that the owner of any other species of property may exercise over it.Palmer v. De Witt, 47 N.Y. 532. There has been some diversity of opinion as to what would constitute such a dedication of a dramatic or musical composition to public use as would take away the exclusive right of its owner. At one time it was held that while the representation of a play, before an indiscriminate audience, did not give the auditors a right to make a copy for reproduction, by taking notes stenographically or otherwise, yet if a copy could be obtained by mere force of memory, the reproduction of the play, by means of a copy thus procured, would not constitute an actionable invasion of the owner's rights. This doctrine was first declared, I believe, by Judge Cadwalader, sitting as judge of the circuit court of the United States, inKeene v. Wheaton, 9th Am. Law Reg. 33, and was subsequently followed by the supreme court of Massachusetts, in Keene v.Kimball, 16 Gray 545, but it has recently been repudiated by the last-mentioned court, in Tompkins v. Hallock,133 Mass. 32. In the case last cited, it was decided that the production of a play gives an auditor no right to take a copy, by any means whatever, for reproduction. The court say: "The ticket of admission is a license to witness the play, but it cannot be treated as a license to a spectator to reproduce the play, if he can, by memory, recollect it." The modern doctrine would seem to be much more consonant with good sense and ordinary notions of justice than that which was first adopted.
There seems also to be some contrariety of opinion whether or not a publication, by an owner, of his composition in a particular form, for a limited purpose, or for use in a particular way, will not operate as a complete abandonment, and make his property public property. There are cases which hold that a donation of such property to the public for one purpose authorizes the public to use it for all purposes. A recent English case — Boosey v. Fairlie, L.R. (7 Ch. Div.) 301 — holds otherwise. In this case it appeared that Offenbach, a distinguished musical composer, composed the orchestral score of a comic opera entitled "Vert-Vert," and afterwards sold his composition to Boosey, a London publisher. The opera had been played in Paris before Offenbach made his sale to Boosey, and it also appeared that before the sale to Boosey two arrangements of the music for use on the piano, one with voices and one without, had been made and published and sold in Paris with Offenbach's consent. Shortly after his purchase, Boosey procured the subject of his purchase to be copyrighted, but did not procure a copyright for either of the piano arrangements. The defendant procured a new orchestration of the music to be made from one of the piano arrangements, and then brought out the opera at the St. James Theatre, in London. Boosey thereupon brought an action to restrain the defendant from producing the opera. The case, in the first instance, was heard by Vice-Chancellor Bacon, who refused an injunction, and dismissed the bill. On appeal, the judgment below was reversed. The court of appeal, consisting of Lords Justices Thesiger, James and Baggallay, in pronouncing the judgment of reversal, said: "We are of opinion that a dramatic representation in which a substantial and material part of the music of Offenbach's opera has been performed, constitutes an infringement of the sole right of performing that music, even though the operatic score may have been obtained by independent labor bestowed upon the unprotected piano arrangement. There is scarcely any popular opera, the score of which is not, within a short time after its first appearance, arranged for the piano, and if, by reconversion of the piano arrangement into an operatic score, a task which could be executed by any skilled musician, and performance of that score, the penalties of infringement could be escaped, the protection given to operatic compositions would be almost nugatory." The court also said that the previous cases of Reade v. Lacey, 1 Johns. H. 524, and Reade v.Conquest, 11 C.B. (N.S.) 479, had decided the very point in question in conformity to the views which controlled their decision. The judgment of the court of appeal was affirmed by the house of lords. Fairlie v. Boosey, L.R. (4 App. Cas.) 711. InPalmer v. De Witt, supra, the court of appeals of New York said: "When a literary work is exhibited for a particular purpose, or to a limited number of persons, it will not be construed as a general gift, or an authority for any purpose of profit or publication by others. An author retains his right in his manuscript until he relinquishes it by contract or some unequivocal act indicating an intent to dedicate it to the public."
This question is an open one in this state, it never before having been presented for judicial consideration here. The court is at liberty, therefore, to adopt such rule respecting it as, in its judgment, is best calculated to give just protection to a species of property which, it is obvious, must increase in value as the people advance in intellectual culture. The rule which I think should be adopted may be stated as follows: that the owner of a dramatic or musical composition may, like the owner of any other kind of property, do with his own as he pleases; he may retain it for his own use and benefit, or he may give it to the public out and out, or he may make a limited or partial dedication of it, and when his act of dedication is of such a character as to show unmistakably that he does not intend to abandon all right, but simply to give the public the right to have a limited use of his property, or to use it in a particular way, and to reserve to himself whatever is not plainly given, the public acquire the right to use his property to the extent of his dedication, but nothing more, and any use of it in excess of the extent dedicated is in violation of his reserved rights. To illustrate: if the composer of an orchestral score of an opera arranges his score for use on the piano, either in whole or in part, and then causes his arrangement to be published and sold, he thereby donates his music to the public for use on the piano, but that is the whole extent of his gift. He does not thereby authorize another composer to make a new orchestration of his music, and perform it in public for profit. Such a use of his gift would very likely seem to him to be a piratical abuse of his liberality.
The defendant disputes the complainant's right to an injunction. He says, first, that the complainant shows no title to the dialogue or music of "Erminie." This is true as to the music. No title to that is either established by the proofs, or alleged in the bill, except so far as a general allegation that the complainant had, by his contract with Paulton, acquired an exclusive right to the operetta called "Erminie," may be regarded as an assertion of title to the music. There is no proof, however, that Paulton himself composed or arranged the orchestral score of the music, or that he has acquired the title of the person who did. But a title to the dialogue, together with a title to everything else which constitutes an essential part of the operetta, except the music, is both alleged and proved. The complainant has, unquestionably, shown a sufficient title to entitle him to protection against a mere wrong-doer.
The defendant also denies that "Erminie" is an original work to a sufficient extent to make it the proper subject of private ownership. His contention in this regard is, that all its leading incidents and features have been taken or borrowed from other dramatic works which have long since been abandoned and thus become public property. This ground of defence presents a question which, in the great majority of cases, cannot be decided before final hearing without great danger of doing injustice to the complainant. It is not necessary that a work of this kind should be entirely original, or original in anything except its arrangement or construction, to be private property. A play or other dramatic work, which is composed wholly of selections from literary or dramatic compositions which are public property, may possess so much originality in its construction, or be so unique in its dramatic effect, as to display a very high order of dramatic skill and talent. Such a work would be the proper subject of private ownership simply in virtue of its originality in construction. Where a dramatic work, existing only in manuscript has, as in this case, been put on the stage by its owner at great expense, and been reproduced in the largest city of the country over five hundred times, without the least question being raised as to its originality by either critic or competitor, the court, before it denies to its owner the protection of the law, should require the person, who asserts a right to use it for his own profit, on the ground that it is public property, to prove his right by convincing evidence.
The person who claims to be the author of "Erminie" swears that it is an original production, and not an imitation of any previous work; that it is his original creation, he having originated its scenes, incidents, stage appurtenances and casts of character and their individualities, as also the dress and deportment of its dramatis personæ This, if true, establishes the fact of its originality. This witness speaks concerning a subject about which his knowledge must necessarily be more complete than that of any other person. His evidence must be accepted as true until evidence of the most convincing kind is produced, showing that his evidence is false. There is no such evidence in this case. The nearest approach to it, which the proofs on the part of the defendant make, is the affidavit of a dramatic writer, who swears that he has made an extended comparison of "Erminie" with the several sources from which he believes "Erminie" has been taken, and he gives several pages of what he regards as similarities and analogies, but an examination of the result of his comparison shows many instances in which the similarity is very slight, and others in which there is none. My examination of his comparison has rather served to convince me that "Erminie" possesses sufficient originality to entitle it to legal protection, than that it is so near a mere transcript of other dramatic works as to place it beyond the protection of the law. Besides, it should be remarked that it appears that this comparison was made without the aid of the libretto of "Erminie," and with no standard to guide the judgment of the person making the comparison, but his recollection of "Erminie" after having seen it performed, as he says, several times, but without stating how many he means by "several." A judgment thus formed is obviously too loose and untrustworthy to be worth much as evidence. It is utterly insufficient to be the basis of a judicial decree.
The defendant also says that his operetta is an original work. This claim constituted his main defence as his affidavits stood when they were first laid before the court. His case in substance at that time was this: that his operetta — "Robert Macaire; or, the Two Thieves" — was composed by a dramatic writer by the name of Matthew C. Woodward, from an old drama known as "Robert Macaire; or, the Two Murderers," and that at the time Woodward wrote his work he had not seen or heard "Erminie," and could not, therefore, have borrowed anything from "Erminie." These facts were positively affirmed by Woodward in his first affidavit. He also swore that after preparing his work he had witnessed a performance of "Erminie," and that he was thus enabled to state, as a fact, that his work was not identical with "Erminie," nor a colorable imitation of it. And he also swore that there was no similarity between the two works, except such as would naturally exist between two adaptations having a common origin. It was also shown by the defendant's affidavits that Woodward composed his work between the summer of 1885 and December, 1886, and that he sold it to the defendant in March, 1887. And it also appeared that the defendant, after his purchase, procured Woodward's work to be revised by two other writers. In this condition of the proofs, it was impossible to say — the librettos not being before the court so that they could be compared — that the defendant's operetta was not just as much of an original work as the complainant's. The proof in support of its originality was quite as strong and convincing as that in support of the originality of the complainant's work.
But the complainant subsequently produced an affidavit, made by Woodward, in which he stated that it was not true, as he had deposed in his previous affidavit, that he had not seen "Erminie" performed before he prepared the edition of his work which he sold to the defendant, but that the truth was that he had seen it performed before that time, and that he had taken notes and made sketches in a book of the performance, and that he had used the material thus obtained in preparing the edition of his work which he sold to the defendant. He also swore that he had requested that these facts should be incorporated in his first affidavit, but was told that it was not necessary that they should be inserted, as they were of no value. On the production of this affidavit an order was made, with the consent of the counsel of the defendant, directing that depositions be taken to show the circumstances under which Woodward's first affidavit was made. The depositions taken under this order relieve the New York counsel of the defendant from the least suspicion that he was in the slightest degree responsible for or in any way a party to the imposition which was attempted to be practiced upon the court by laying before it an affidavit which was known to be false in its very essence. They also show, if Woodward can be believed, that the defendant's play is a bold imitation of that belonging to the complainant. Woodward, on his examination under this order, produced not only the book containing the notes and sketches which he made when he witnessed the performance of "Erminie," but also a book containing a copy of the manuscript which he sold to the defendant in March, 1887. This manuscript was present in the office in New York where Woodward's first affidavit was drawn; and although it was known to constitute what Woodward then swore was a dramatic composition, which he had written before he had seen "Erminie" performed, and which he knew, from afterwards having seen "Erminie" performed, was not an imitation of "Ermine," yet neither he nor the person who drew his affidavit thought it worth while to consult the manuscript, either to see whether there was any similarity between it and "Erminie," or to obtain facts tending to show in what respects they were dissimilar. But it now appears, from the copy which Woodward produces, that, on the second page of the book then in the defendant's possession, there are two lists of characters, given in parallel columns, one under the head of "Erminie" and the other under the head of "Macaire," and that the characters under the head of "Macaire," although they bear names differing from the names borne by the corresponding characters given under the head of "Erminie," in the play perform substantially the same parts in the one that they do in the other. For example: the two thieves which appear in "Erminie" under the names of "Ravennes" and "Cadeaux," one adroit and audacious, and the other a stupid blunderer, appear substantially in the same characters in the defendant's play under the names of "Robert Macaire" and "Jacques Strop." This fact, taken in connection with the facts stated in affidavit annexed to the bill, in which a person who witnessed the performance of both the complainant's and defendant's plays, at Trenton, in October last, swears that the music of the defendant's operetta is very similar to that of "Erminie" throughout, and that some parts of the dialogue of the defendant's operetta are exactly like parts of the dialogue of "Erminie," the language of each being identical, would seem to establish a sufficient case of similarity or imitation to entitle the complainant to temporary protection, at least.
But the defendant says that Woodward stands self-impeached, and that his whole evidence should, for that reason, be rejected. His first affidavit is unquestionably false in important respects. I am not fully convinced, however, that he alone is responsible for its falsehood. This is a case in which it appears that the draft of at least one affidavit was made, not as the person who was to be asked to swear to it said the facts were, but as its draftsman imagined they were. But one thing is certain: Woodward is not a witness whose testimony should receive full credit without corroboration. His evidence is, however, corroborated in its most vital point in the strongest manner. He swears that the manuscript book, which he produces, contains a copy of the play which he sold to the defendant. This book shows on its face that the defendant's play is an imitation of the complainant's play. The complainant has asked the defendant for his book that it might be put in evidence. The defendant has not produced it. If the manuscript produced by Woodward is not a substantial transcript of the manuscript he sold, the defendant would undoubtedly have produced his copy, for its production would, in that case, have shown, not only that Woodward's last evidence is false, but also that the evidence of imitation, which the copy furnishes, is likewise false. Woodward stands as the foundation of the defendant's defence. His play, the defendant says, was originated by Woodward, and that Woodward, in composing it, borrowed nothing from "Erminie." This is the fact on which the defence rests. If it is not true, there is no defence. Woodward originally said the same thing that the defendant says — that is, that the defendant's play is not an imitation of "Erminie." And he said it under oath. Now, however, he says exactly the opposite; and he supports his last statement by a species of proof which bears upon its face the very strongest evidence of its truth. The defendant says, however, that the court should make no use of the depositions taken under its order further than may be necessary to ascertain whether or not Woodward was tricked into making an affidavit which he did not intend to make. To so limit the use of the depositions in this case would require the court to shut its eyes so as not to see the truth, in order that a judgment might be pronounced contrary to the right of the case. Where an affidavit, false in a material respect, has been laid before the court for the purpose of influencing its judgment, the court should always, both for the purpose of protecting itself against imposition and also to avoid a miscarriage of justice, be swift to lay hold of any trustworthy evidence which comes before it tending to show what the real truth is in respect to the controverted matters of fact. The proofs now before the court convince me that the play which Woodward sold to the defendant is an imitation of "Erminie" to a sufficient extent to render its production in public for gain an invasion of the complainant's rights.
But the defendant says that Woodward's play has been rewritten in such manner as to make it substantially a new play, and that he now uses this new edition. But which edition did he use at Trenton? Woodward's or the other? He has not said that Woodward's edition was not used there; but, whether it was or not, the proof is that the edition used there in October last was an imitation of "Erminie." The complainant's proof on this point stands undisputed. And it is the play performed at Trenton in October last that the complainant seeks to have enjoined. I think he is entitled to an injunction restraining the defendant from producing an operetta which, in its scenery, casts of characters, and their individualities, and the dress and deportment of itsdramatis personæ, is either identical with or an imitation of the operetta called "Erminie."
On the argument it was very vigorously contended by the counsel of the defendant that no injunction should be granted in this case until the fact of similarity or imitation was established by a comparison of the two librettos; and the counsel of the complainant were challenged to put the libretto of their client in evidence in order that such comparison might be made, the counsel of the defendant offering to put the defendant's in as soon as the complainant's was produced. While the production of the librettos might, very perceptibly, have diminished the labor necessary to the proper consideration of the case, no rule of evidence of which I am aware makes the production of the complainant's libretto, on such an application as this, indispensable to his success, if he can by other sufficient evidence establish the facts necessary to show that he is entitled to the protection he asks. As already stated, I think the complainant has, by other sufficient evidence, established a case against the defendant which entitles him to an injunction.
 *Page 249