CHARLES FROHMAN *et al.* Plaintiffs in Error, *vs.* RICH-
ARD FERRIS, Defendant in Error.

*Opinion filed February 19, 1909.*

1. COPYRIGHT—*common law right of an author in unpublished manuscript.* At common law the author of an intellectual production, including literature, drama, music, art, etc., had an absolute property right in his production, of which he could not be deprived so long as the same remained unpublished, nor could he be compelled to publish it, and he might permit the use of his production by one or more persons to the exclusion of others, and give a copy of the manuscript to another person without parting with his property in it.

2. SAME—*common law rights of author cease upon publication.* The common law property right of an author in his production continues only while the production remains unpublished, and upon its first publication the production becomes public property unless it is protected by statute, in which case the statutory right supersedes the common law right, as both cannot exist in the same production.

3. SAME—*the author of a drama does not lose rights in United States by public performance.* There is no provision in the Federal copyright law securing to the author of a drama the exclusive right to perform it except where the drama is printed in a book, but the common law rights apply in such cases; and in the United States an author does not lose his rights in a manuscript play by public presentation thereof, although a different rule prevails in England under the act of 5 and 6 Victoria, which makes the public performance of a play equivalent to a publication.

4. SAME—*when right to perform a manuscript play by English author is not lost.* The exclusive right to publicly present in the United States a manuscript play by an English author is not lost by reason of the fact that prior to the assignment of such right by the author the play had been publicly presented in England, (which, under the law of England, is equivalent to a publication,) and the assignee may .enjoin the production of the play by another person who has printed an adaption thereof and copyrighted the same in the United States.

WRIT OF ERROR to the Branch Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. JOSEPH E. GARY, Judge, presiding.

This is an appeal from a judgment of the Appellate Court reversing a decree of the superior court in a proceeding begun in the circuit court by plaintiffs in error for an injunction and other relief against defendant in error.

There is no controversy as to the facts. In 1894 Charles Haddon Chambers and B. C. Stephenson, dramatic authors and playwriters, citizens and residents of London, England, created and invented a dramatic composition entitled "The Fatal Card." Said composition was original with said Chambers and Stephenson, possessed considerable literary merit and was of substantial value to the authors as a literary product. It was a melodrama in five acts, written in manuscript form and was never printed. It was with the consent of the authors publicly performed at the Adelphi Theater, London, England, September 6, 1894, by A. and S. Gatti, theatrical managers, who had acquired an interest from the authors in the royalties to be derived from a performance of the play. Plaintiff in error Charles Frohman is a citizen of the United States, and on March 25, 1895, purchased all the right, title and interest of Stephenson in said melodrama, with the exclusive right to produce and perform it in the United States of America and Canada. The play was never copyrighted in the United States.

It was publicly produced under the supervision of Frohman in cities of the United States and Canada and appears to have met with popular favor and to have been a success financially. Afterwards, George E. MacFarlane adapted the composition of Chambers and Stephenson, called it by the same name, "The Fatal Card," and transferred it to defendant in error, who caused it to be copyrighted in the United States, and thereafter produced and performed it in various cities of the United States until enjoined from so doing under the bill filed in this case. It is not denied that the master's conclusion that the MacFarlane play "is substantially identical with the play claimed by the complainants" was justified by the evidence.

The bill alleged that at the time Ferris obtained from MacFarlane the pirated copy of "The Fatal Card" he had full knowledge of complainants' rights; that he deceived the public by inducing them to believe that the play produced was the play of said Charles Frohman and his associates; that he made large profits by the production of said play, to the injury of the complainants, and the bill prayed for an accounting and that the further production of the play by defendant in error be enjoined. After answer and replication filed the case was referred to a master in chancery to take the testimony and report his conclusions of law and fact. The master reported that in his opinion complainants failed to establish an exclusive right to produce the play in the United States and that the prayer of their bill should be denied and the bill dismissed. Objections to this report filed by the complainants were overruled by the master, and the cause was heard by the chancellor on the report of the master and exceptions filed thereto by complainants. A decree was entered disapproving the master's report and finding that complainants had the exclusive right in the United States to represent and perform, and to allow others to represent and perform, the said melodrama, "The Fatal Card," and to otherwise use and enjoy the same,

and it was ordered that the temporary injunction theretofore issued be made perpetual, and that the defendant, Ferris, account to the complainants for the profits and royalties received by him through the production of the play. From this decree the defendant prosecuted an appeal to the Appellate Court for the First District, and that court reversed the decree of the superior court and remanded the case, with directions to dismiss the bill. Complainants in said bill have sued out a writ of error from this court to review the judgment of the Appellate Court.

MAYER, MEYER & AUSTRIAN, for plaintiffs in error:

The public performance, in England, of a manuscript play, which under the English statute is made a publication and deprives the author of his common law right of exclusive representation, does not deprive the English author of such common law right in this country, where public performance is not deemed a publication. *Crowe* v. *Aiken,* 2 Biss. 208; *Palmer* v. *DeWitt,* 2 Sweeney, 530; *Tompkins* v. *Halleck,* 133 Mass. 32; Drone on Copyright, 118-121, 450, 555, 574; Wandell on Law of the Theater, 479; 25 Cyc. 1497.

At common law and before the passage of copyright statutes an author had an exclusive property right in his manuscript. Drone on Copyright, 102, *et seq.; Rees* v. *Peltzer,* 75 Ill. 475.

The public performance of a manuscript drama is not in this country a publication of the drama, but the author still retains his common law right to its exclusive representation. 25 Cyc. 1497, and cases cited; Drone on Copyright, 119; *Palmer* v. *DeWitt,* 2 Sweeney, 530; *Tompkins* v. *Halleck,* 133 Mass. 32.

A different rule prevails in England by the statutes 3 and 4 William IV, chap. 15; 5 and 6 Victoria, chap. 45, sec. 20; *Boucicault* v. *Delafield,* 1 H. & M. 597; *Boucicault* v. *Chatterton,* 5 L. R. Ch. Div. 267; Drone on Copyright, 119,

288—28

574, 605, 656, 571; Scrutton on Copyright, sec. 125; Macgillivray on Copyright, 126, *et seq.*

The *lex domicilii* cannot fix the status of literary property where the author seeks to enforce rights in respect thereto in a foreign country. Drone on Copyright, 581; *Crowe* v. *Aiken,* 2 Biss. 208; *Palmer case,* 47 N. Y. 532.

ALDRICH & McROBERTS, and L. E. CHIPMAN, for defendant in error:

The protection given to copyrights in this country is wholly statutory. *Music Co.* v. *Apollo Co.* 209 U. S. 1; *Wheaton* v. *Peters,* 8 Pet. 591; *Banks* v. *Manchester,* 128 U. S. 244; *Thompson* v. *Hubbard,* 131 id. 123; *Tobacco Co.* v. *Werckmeister,* 207 id. 284.

It was not the intention of Congress to give to foreign citizens and composers advantages in this country which, according to the international copyright convention, were to be denied to citizens of this country abroad. *Music Co.* v. *Apollo Co.* 209 U. S. 1.

No copyright can be obtained in this country after a publication in this or any foreign country. U. S. Rev. Stat. sec. 4956.

A play is peculiar property,—an intangible chose in action,—personal in character, as distinguished from real or mixed, and is governed by the *lex domicilii.* Drone on Copyright, 100-104; Scrutton on Copyright, 127; *Miller* v. *Turner,* 4 Burr. 2396; *Bobbs-Merrill Co.* v. *Straus,* 210 U. S. 339; *Minor* v. *Cardwell,* 37 Mo. 350; *McLean* v. *Hardin,* 3 Jones' Eq. 294; *Owen* v. *Miller,* 10 Ohio St. 136; Story on Conflict of Laws, (7th ed.) sec. 380.

Publication puts an end to common law rights and all rights of the author or proprietor, unless he at the same time takes steps to initiate and secure statutory rights. Drone on Copyright, 100-104; Macgillivray on Copyright, 36-38; *Mercantile Agency* v. *Publishing Co.* 155 N. Y. 241; *Mifflin* v. *White Co.* 190 U. S. 260; *Mifflin* v. *Dutton,* id. 265.

The two rights do not co-exist in the same composition. Drone on Copyright, 100-104; *Fraser* v. *Yack,* 116 Fed. Rep. 285; *Bobbs-Merrill Co.* v. *Straus,* 210 U. S. 339; *Tompkins* v. *Halleck,* 133 Mass. 32; *Mercantile Agency* v. *Publishing Co.* 155 N. Y. 241.

There can be but one publication, and it makes no difference where this is made, if with the consent of the author or proprietor. *The Mikado case,* 25 Fed. Rep. 183; Drone on Copyright, 293, 295, 577; *Pierce Manf. Co.* v. *Werckmeister,* 72 Fed. Rep. 54; 7 Am. & Eng. Ency. of Law, (2d ed.) 528; 25 Cyc. 1495, and cases cited.

The statute 5 and 6 Victoria, (chap. 45, sec. 20,) makes public performance of a dramatic work, with the author's or owner's consent, equivalent to the first publication of a book. *Boucicault* v. *Chatterton,* 5 L. R. Ch. Div. 267; *Boucicault* v. *Delafield,* 1 H. & M. 597; Drone on Copyright, 574, 576.

The cases cited by counsel for plaintiffs in error are distinguished from the present case in that no copyright had been taken in the cases cited. In so far as any of these cases are in conflict with the contentions here made, they are overborne by authority of the Supreme Court of the United States.

Mr. JUSTICE FARMER delivered the opinion of the court:

Plaintiffs in error base their exclusive title and right to perform said play upon what they contend to be their rights under the common law. Defendant in error contends that the public performance of the play in England with the consent of its authors, without causing it to be copyrighted in this country, was, so far as this country is concerned, such an act of dedication to the public as to extinguish the common law rights of the authors or their assignees in the United States.

At common law the author of a literary composition had an absolute property right in his production which he

could not be deprived of so long as it remained unpublished, nor could he be compelled to publish it. This right of property exists at common law in all productions of literature, the drama, music, art, etc., and the author may permit the use of his productions by one or more persons to the exclusion of all others and may give a copy of his manuscript to another person without parting with his property in it. (Drone on Copyright, p. 101, *et seq.*) "So, also, without forfeiting his rights he may communicate his work to the general public, when such communication does not amount to a publication within the meaning of the statute. * * * It may be transmitted by bequest, gift, sale, operation of law, or any mode by which personal property is transferred." (Ibid. 104.) Upon the publication of the production the author's common law rights ceased, and it became public property unless protected by statute.

To protect the rights of authors in their productions after publication, statutes in various countries have been enacted. Prior to 1891 an alien could not, under the copyright statutes in the United States, obtain a copyright upon his production, and the publication by an author in a foreign country by printing his production was held to have the effect of destroying his common law rights in his production in this country and it became public property here. In March, 1891, Congress passed an act which extended to citizens of foreign countries the privilege of copyright in this country when such foreign countries granted the same privilege to citizens of the United States, and the statute provided that the existence of the conditions that authorized citizens of foreign countries to avail themselves of the privileges of copyright in this country "shall be determined by the President of the United States by proclamation made from time to time, as the purposes of this act may require." On July 1, 1891, the President of the United States by proclamation announced that the laws of Great Britain and the British possessions permitted citizens of the United

States the benefit of copyright on substantially the same basis as citizens of those countries, and the act of Congress therefore became effective and its benefits available to citizens of Great Britain and the British possessions. Section 4956 of our copyright statute provides that "no person shall be entitled to a copyright unless he shall, before publication, deliver at the office of the Librarian of Congress, or deposit in the mail, addressed to the Librarian of Congress, at Washington, District of Columbia, a printed copy of the title of the book or other article  *  *  *  for which he desires a copyright, nor unless he shall also, within ten days from the publication thereof, deliver at the office of the Librarian of Congress, or deposit in the mail, addressed to the Librarian of Congress, at Washington, District of Columbia, two copies of such copyright book or other article." Even after the taking effect of the act of 1891 an English author could not, after publication of his production in England, secure a copyright in this country, but in order to avail himself of that privilege it became necessary that simultaneously with his publication and securing a copyright in England he also comply with the copyright statutes in this country. A publication of his production without such compliance with our statutes prevented him from afterwards securing the benefits of our copyright statutes and rendered the publication public property in this country. There is no provision in our statute for securing to the author of a drama the exclusive right to perform it except where the drama is printed in a book, but the common law rights apply in such cases and the author does not lose his rights in the production by public representation. Drone on Copyright, p. 119.

By the English statute 3 and 4 William IV, (chap. 15,) which was amendatory of an act passed in the thirty-fourth year of the reign of his late majesty King George III, it was provided: "And whereas it is expedient to extend the provisions of the said act, be it therefore enacted by the

king's most excellent majesty, by and with the advice and consent of the lords spiritual and temporal, and commons, in this present parliament assembled, and by the authority of the same, that from and after the passing of this act the author of any tragedy, comedy, play, opera, farce, or any other dramatic piece or entertainment, composed and not printed and published by the author thereof or his assignee, or which hereafter shall be composed and not printed or published by the author thereof or his assignee, or the assignee of such author, shall have as his own property the sole liberty of representing, or causing to be represented, at any place or places of dramatic entertainment whatsoever, in any part of the United Kingdom of Great Britain and Ireland, in the Isles of Man, Jersey and Guernsey, or in any part of the British dominions, any such production, as aforesaid, not printed and published by the author thereof or his assignee, and shall be deemed and taken to be the proprietor thereof; and that the author of any such production printed and published within ten years before the passing of this act by the author thereof or his assignee, or which shall hereafter be so printed and published, or the assignee of such author, shall from the time of passing this act or from the time of such publication, respectively, until the end of twenty-eight years from the day of such first publication of the same, and also if the author or authors, or the survivor of the authors, shall be living at the end of that period, during the residue of his natural life, have as his own property the sole liberty of representing, or causing to be represented, the same at any such place of dramatic entertainment as aforesaid, and shall be deemed and taken to be the proprietor thereof." This act was amended by the act 5 and 6 Victoria, (chap. 45,) passed in 1842, which was a comprehensive enactment covering the subject of copyright in England, one provision of which, relating to dramatic pieces and musical compositions, reads as follows: "Be it therefore enacted that the provisions of the

said act of his late majesty, and of this act, shall apply to musical compositions, and that the sole liberty of representing or performing, or causing or permitting to be represented or performed, any dramatic piece or musical composition shall endure and be the property of the author thereof, and his assigns, for the terms of this act provided for the duration of copyright in books; and the provisions hereinbefore enacted in respect of the property of such copyright, and of registering the same, shall apply to the liberty of representing or performing any dramatic piece or musical composition as if the same were herein expressly re-enacted and applied thereto, save and except that the first public representation or performance of any dramatic piece or musical composition shall be deemed equivalent, in the construction of this act, to the first publication of any book."

The effect of these statutes was to substitute, after the first publication, for the common law right of the author the statutory right to represent or perform his production for the period limited by the statute. The public performance of the play in England had the effect of divesting the authors of their common law rights and investing them with the right conferred by the statutes. The act of 5 and 6 Victoria, above quoted, provides "that the first public representation or performance of any dramatic piece or musical composition shall be deemed equivalent, in the construction of this act, to the first publication of any book." Before the adoption of said act the public performance of a dramatic piece was not equivalent to the publication of a book, and as we have said, the common law rights of the author were unaffected thereby. When the statutory conditions were complied with, the rights conferred thereby attached and the common law rights ceased. Drone, in his work on Copyright, says (p. 100): "Property in intellectual productions is recognized and protected in England and the United States both by the common law and by the

statute, but as the law is now expounded there are important differences between the statutory and the common law right. The former exists only in works which have been published within the meaning of the statute, and the latter only in works which have not been so published. In the former case ownership is limited to a term of years; in the latter it is perpetual. The two rights do not co-exist in the same composition. When the statutory right begins the common law right ends. Both may be defeated by publication."

It is not disputed that a performance of "The Fatal Card" in England was, by the statute referred to, a publication, and that in that country the author's common law rights thereupon ceased. Defendant in error contends that when the authors of the drama surrendered their common law rights in England for the rights conferred by the statutes they ceased to have any common law rights in the production, in England or elsewhere. The plaintiffs in error contend that as under our laws the performance of the manuscript drama is not a publication of it and does not deprive the author of his common law rights, and as our statute provides no means for copyrighting a drama unless it is printed and published in a book, our courts, in deciding what is such a publication as to divest the author of his common law rights, are not to be governed by what the English statute declares shall constitute a publication thereof. It is not by virtue of any statute that it has been decided the publication of a book, either in this country or in England, is a surrender by the author of his common law rights and a dedication to the public unless protected by copyright under the statute. The basis of such decisions is, that by causing the book to be printed without the protection of the copyright the author is deemed to have relinquished all rights, both common law and statutory, and to have dedicated his production to the public; and this applies to books published in foreign countries as well as in this country. In the absence of the provision of the Eng-

lish act referred to, that the first public representation or performance of a dramatic piece shall be deemed equivalent, in the construction of that act, to the first publication of a book, it could not be claimed that the performance of "The Fatal Card" in England was a publication, any more than would its performance in this country, while it remained unprinted, be deemed a publication. The object of copyright statutes is to protect the authors' rights to their own productions. There is no international copyright law or agreement between this country and England providing for the copyrighting of manuscript dramas, and we have seen "The Fatal Card" could not have been copyrighted in this country without printing.

In Drone on Copyright the author says there are essential differences between the right to multiply and dispose of copies of an intellectual production and the right to represent a literary or musical composition, though both are often called copyright. On page 553 the author says: "A dramatic composition is capable of two distinct public uses: It may be printed as a book and represented as a drama. With respect to the former use, there is no distinction, in law, between a dramatic and any other literary composition. The exclusive right of multiplying copies is called copyright. But this does not embrace the right of representation. As these two rights are wholly distinct in nature, it is not only important, but necessary, that they should be distinguished in name. The property in a dramatic composition is often called dramatic copyright. But this expression is faulty and inaccurate. If it refers to the exclusive right of printing a drama it would be equivalent to the name poetic copyright, prose copyright or historical copyright, as applied to works in poetry, prose or history. If its use is restricted to the right of representing a drama it is not accurate, because this is not a right to multiply copies in the proper meaning of that expression, and cannot, therefore, strictly be called copyright. If it is intended as a

name for both rights together, it can serve only to increase the confusion which should be wholly removed. The sole liberty of publicly performing a dramatic composition might more properly be called dramatic right or acting right. The expression 'stageright,' coined by Charles Reade, is not uncommon, but there are objections to this word with respect both to its formation and the purpose which it is required to serve. I have adopted playright as being, in my judgment, the best name for the purpose. It is a convenient, euphonious word, and its formation is analogous to that of copyright. As the latter word literally means the right to copy a work or the right to the copy, so playright means the right to play a drama or the right to the play; and it may properly be used to mean not only the right of representing a play, but also the right of performing a musical composition."

It would seem, therefore, that there is a logical distinction to be observed in dealing with the effect upon the authors' rights of the public performance of an unprinted drama and the publication of a printed book. It is not contended that the English statute has any extra-territorial effect, but, as we have said, the contention is that as under the English statute a performance of the drama was made a publication of it so that the authors' common law rights ceased and their statutory rights attached in that country, it necessarily follows that the authors and their assignees can claim no common law right in this country.

A case much in point upon the question here involved is *Crowe* v. *Aiken*, 2 Biss. 208. That was, like this, a bill to enjoin the defendant, the manager of a theater in Chicago, from producing a play owned by the complainant. The play was a drama entitled "Mary Warner." Its author, Tom Taylor, was a subject of the queen of Great Britain. The play was written for the plaintiff's wife, who was an actress and intended to impersonate the principal character. It was not intended for publication but for rep-

resentation on the stage. After completion of the play the author transferred to the complainant all his right thereto and in the manuscript thereof, together with the exclusive right of representation on the stage in the United States for five years from June 1, 1869. The play was first represented at the Haymarket Theater, in London, in June, 1869, and afterward the complainant and his wife came to the United States and performed it in the city of New York. The bill alleged that the play had never been printed by the complainant nor the author, nor with their consent, nor published otherwise with their consent than by representation on the stage; that the defendant did not produce it at his theater by means of the memory of those who had witnessed it on the stage, but by a copy wrongfully and surreptitiously obtained from the manuscript or from a printed copy wrongfully and fraudulently printed. The case came before the court on a motion to dissolve the preliminary injunction, and on the hearing an affidavit of one DeWitt was read, in which he stated he furnished defendant with the copy of the play used by him; that he procured it from a person in London, etc., and that he (affiant) was advised that by section 20 of 5 and 6 Victoria, (chap. 45,) "the first representation or performance of any dramatic piece in England is deemed equivalent to the first publication of a book." It will thus be seen that the facts in that case make the decision applicable to the case at bar. The opinion was by Judge Drummond, and while almost the entire discussion therein is pertinent to the present case, we quote a part of it, as follows: "Mr. Taylor, then, was the proprietor of the drama 'Mary Warner' when finished, and when transferred to the plaintiff the latter became the proprietor on the terms of the transfer. Has the right of property been lost? It is conceded that it would be lost by any general publication of the play by the proprietor which could be regarded as a dedication to the public, but save this it is difficult to fix on any rule which shall meet

the case. The giving of a copy, or of several copies, of a manuscript will not necessarily be a publication. The representation of a play on the stage was decided in England, before the statute of 5 and 6 Victoria, not to be a publication. * * * There was some question whether the author of a play had, at common law, the sole right of representation; but so long as the play existed in manuscript and was unpublished, and not in some way dedicated to the public, the sole right of representation or performance would seem to follow from the exclusive right of property. But the twentieth section of the statute of 5 and 6 Victoria, (chap. 45,) put an end to this question by declaring that the first public representation or performance of any dramatic piece should be deemed equivalent, in the construction of the act, to the first publication of any book; and I understand it has been decided in England that the public performance, even in a foreign country, of a play of which an English subject is the author, defeats his claim to a copyright under the British statutes. It is insisted that as by this statute representation was publication, the play 'Mary Warner,' by performance in England, was published there, and all right of property in the play was consequently lost, as well there as in the United States. This necessarily leads to the conclusion,—and that is substantially the position of defendant's counsel,—that there is no right of property in this country in the play except that conferred by the statutes, and particularly that of August 18, 1856. I do not understand that the authorities have gone that far, and it does not follow because his claim under the statute is gone that everything is lost. He may still stand on his natural, inherent right as the author and creator of the play, and maintain that right until in some mode, in reason or by statute, it is dedicated to the public. * * * Neither, perhaps, can there be any doubt that Congress can declare what sort of publications of a literary or dramatic work shall constitute a dedication to the public. It follows

from what has been said that a definition of the word 'representation' by a British statute is not operative as such in this country, and in all the cases which have arisen here recently upon the rights of authors to unpublished plays written by Englishmen, the objection that their rights in this country were destroyed in consequence of the clause already referred to in section 20 of 5 and 6 Victoria (chap. 45) seems not to have been taken either by counsel or the court." The court found that the copy of the play had been obtained in an unlawful way, overruled the motion to dissolve the injunction and continued it in force.

*Tompkins* v. *Halleck*, 133 Mass. 32, was also a bill for an injunction to restrain the defendant from representing at his theater in Boston a drama called "The World." The opinion states that the drama was originally composed in England, where, after being presented, it was sold to one Colwell, of New York. After being successfully produced in New York it was assigned to the complainant, with the exclusive right to represent it in the New England States. It was never copyrighted or printed. While being represented at Wallack's Theater, in New York, two men, Byron and Mora, attended at the theater, and Byron committed as much of the play as he could to memory and after each performance dictated it to Mora until the copy was completed. Byron then made an agreement with the defendant to produce the play at defendant's theater, known as the Alhambra. As produced by the defendant it was called "The World" and was in all substantial particulars identical with complainant's drama of the same name. It is true, as stated by the defendant in error, the greater portion of the opinion of the court is devoted to a discussion of *Keene* v. *Kimball*, 16 Gray, 545, and the reasons given for overruling that case. *Keene* v. *Kimball* held "that the literary proprietor of an unprinted play cannot, after making or sanctioning its representation before an indiscriminate audience, maintain an objection to any such literary or dramatic

re-publication by others as they may be enabled, either directly or secondarily, to make from its being retained in the memory of any of the audience." The court did, however, refer to and comment upon the English statutes, including 5 and 6 Victoria, and held that the complainant was entitled to the relief prayed and to damages sustained by reason of the unauthorized production by the defendant.

In *Palmer* v. *DeWitt,* 2 Sweeney, 530, (40 How. Pr. 293, affirmed 47 N. Y. 532,) an English author of a drama sold to complainant, prior to February 1, 1868, the exclusive right to perform and print it throughout the United States. The drama was performed the first time in the Prince of Wales Theater, London, February 15, 1868, with the consent of the author. The defendant, without authority of complainant, printed the drama and offered it for sale. The complainant sought to enjoin these acts of the defendant, and the defense was that the common law rights in the play were lost by the performance of it in London. The court held contrary to this contention and sustained the complainant's right to the injunction.

Defendant in error contends that *Crowe* v. *Aiken* and *Palmer* v. *DeWitt, supra,* are not in point, for the reason that the author in each of those cases had assigned to the complainant his rights in America before the first public representation of the play in England. Neither of those decisions appears to be based on any such distinction, and in the former it was distinctly stated that a definition of a representation by the British statutes is not operative as such in this country.

It is also claimed by defendant in error that it is not stated in *Tompkins* v. *Halleck, supra,* whether the presentation in England was a public representation of the play. While the word "public" is not used in the opinion where it is stated that the play was presented in England, we think it very clearly appears from reading the opinion that the court could have meant nothing but a public represen-

tation, and as the court was dealing with the effect of a representation of the play in England upon the rights of the author and his assignee in this country, we cannot but consider the decision· in that case applicable to the present case. In *Tompkins* v. *Halleck* the court applied to the decision of the case the rule announced in the opinion, that "the representation of an unprinted work upon the stage is not a publication which will deprive the author or his assignee of his rights of property therein." When it is borne in mind that the court was applying this rule to the play of an English author which had been represented in England, and therefore, by force of the statute,. published in. that country, it cannot reasonably be said, we think, that the case is not in point. Moreover, in that case the assignment of the author's rights was made after the play had been represented in England, and it cannot be said that the English statutes were overlooked, for 5 and 6 Victoria is referred to in the opinion of the court.

In *Boucicault* v. *Delafield*, 1 H. & M. 597, and *Boucicault* v. *Chatterton*, 5 L. R. Ch. Div. 267, the English courts held that the performance of a drama in the United States should be considered as a publication. These cases were decided subsequent to the passage of the act 5 and 6 Victoria, and subsequent to the passage of the act 7 and 8 Victoria, chapter 12. Section 19 of the latter act provided that the author of a dramatic piece which should be first published out of her majesty's dominions should have no copyright therein nor any exclusive right to the public representation or performance thereof. In both the cases referred to Boucicault was the author of dramas that had been first performed in this country and sought to prevent their production in England by persons acting them without his consent or authority. He was denied the relief asked, on the ground that the public representation of the dramas in this country was a publication of them, and by the nineteenth section of 7 and 8 Victoria he was not en-

titled to the protection of the British statutes, and it was said that this was true whether the author of the play was a British subject or an alien. It would follow, therefore, that if "The Fatal Card" had been first performed in this country the English courts would have treated it as a dedication to the public and to have had the effect of divesting the author of any rights whatever, under the laws of England, to its exclusive production.

As the English decisions appear to be based upon provisions of the statute referred to, and there is no such statute in this country, we are of opinion they are not decisive of the question here involved, and this view is sustained, we think, by the cases first above cited. The view of the Appellate Court was, that in *Crowe* v. *Aiken, supra,* the learned chancellor did not have in mind the construction of the English statute adopted by the courts in the decisions we have cited. *Crowe* v. *Aiken* was decided in 1870 and *Boucicault* v. *Chatterton* was not decided until 1876, but *Boucicault* v. *Delafield* was decided in 1863, and Judge Drummond said in *Crowe* v. *Aiken:* "I understand that it has been decided in England that the public performance, even in a foreign country, of the play of which an English subject is the author, defeats his claim to the copyright under the British statutes." From this expression it would seem clear that the author of the opinion was familiar with the doctrine announced in the *Delafield case,* so that the opinion in that respect could not have been based upon any misapprehension. To our minds it is squarely in point and its reasoning sound. Besides, it is in harmony with sound principles of justice, and we are disposed to follow it rather than adopt the rule that we are bound by the decisions of the English courts made under their statute.

The judgment of the Appellate Court will therefore be reversed and the decree of the superior court affirmed.

*Judgment reversed.*